**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

| | | |
|---|---|---|
| J. MICHAEL BROWN; YOUNG AMERICANS FOR LIBERTY AT JONES COUNTY JUNIOR COLLEGE, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | Case No.   2:19-cv-127-KS-MTP |
| v. | ) ) | |
| JONES COUNTY JUNIOR COLLEGE; BOARD OF TRUSTEES OF JONES COUNTY JUNIOR COLLEGE; JESSE SMITH, *in his individual and official capacities*; MARK EASLEY, *in his individual and official capacities*; GWEN MAGEE, *in her individual and official capacities*; STAN LIVINGSTON, *in his individual and official capacities*, | ) ) ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) | **JURY TRIAL REQUESTED** |

## INTRODUCTION

1.      The Supreme Court of the United States has made clear that "state colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). "With respect to persons entitled to be there, our cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities." *Widmar v. Vincent*, 454 U.S. 263, 268 (1981). Yet, Jones County Junior College ("JCJC") maintains policies and practices that force students like J. Michael Brown and the student organization Young Americans for Liberty at Jones County Junior College ("YAL") to seek permission days ahead of time from college administrators before engaging anywhere on campus in even the most fundamental expressive activities protected under the First Amendment,

such as holding up a sign, distributing literature, or engaging fellow students in political discussions.

2.    In contravention of its well-established constitutional obligations as a public institution, JCJC maintains and enforces policies that restrict student speech on campus and force students to seek administrative permissions through undefined "procedures" that give administrators unfettered discretion to grant or withhold campus access.

3.    Enforcing the college's overly-restrictive policies, JCJC administrators and campus police twice stopped Brown and those accompanying him from engaging with fellow students interested in learning about their political club. Twice campus police were called on Brown and he was taken to the chief of police's office to be admonished for attempting to exercise his free speech rights on campus without the administration's prior approval.

4.    As Defendants have demonstrated, "[t]he first danger to liberty lies in granting the State the power" to limit freedom of expression on a public college campus in contravention of the "background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 835 (1995). Plaintiffs Brown and YAL ask this Court to remind JCJC that public educational institutions have a legal obligation to foster, not suppress, freedom of expression because "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy*, 408 U.S. at 180.

5.    This is a civil rights action to protect and vindicate Brown's, YAL's, and all JCJC students' right to freedom of expression under the First and Fourteenth Amendments of the Constitution of the United States. JCJC's policies governing student expression on campus and its enforcement practices unlawfully restrict these rights and are challenged on their face and as

2

applied to Brown and YAL. This action seeks declaratory and injunctive relief, damages, and attorneys' fees and costs.

## JURISDICTION AND VENUE

6.     This action arises under the First and Fourteenth Amendments to the Constitution of the United States and the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

7.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

8.     This Court has the authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

9.     This Court has the authority to issue injunctive relief pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65.

10.    This Court has the authority to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the instant claims occurred within this District and because at least one Defendant resides in this District.

## PARTIES

12.    At the time of filing this Complaint, Plaintiff J. Michael Brown is a resident of Hattiesburg, Mississippi, and he was a student enrolled at JCJC at the institution's Ellisville campus at all times relevant to this Complaint. He served as the president of Young Americans for Liberty at Jones County Junior College at all times relevant to this Complaint.

13.    Plaintiff Young Americans for Liberty at Jones County Junior College is an unrecognized student organization at Jones County Junior College. It is a chapter of the national

organization Young Americans for Liberty, a libertarian advocacy organization with chapters on college and university campuses nationwide.

14.     Defendant Jones County Junior College is a two-year public institution of higher education with its main campus located in Ellisville, Mississippi. Pursuant to Mississippi law, JCJC is a local government agency empowered by the state legislature to provide post-secondary educational services for the people of its geographic area. *See* Miss. Code Ann. § 37-4-1. JCJC maintains and enforces policies, procedures, and practices that violate the constitutional rights of Brown, YAL, and all JCJC students, as described in this Complaint. JCJC and policymakers for the institution were aware or should have been aware of its policies, procedures, and practices, and these policies, procedures, and practices were the moving force leading to the deprivation of the constitutional rights of Brown and YAL, as described below. Despite knowledge of its policies, procedures, and practices, JCJC was deliberately indifferent to the unconstitutionality of those policies, procedures, and practices as well as the constitutional rights of Brown and YAL.

15.     Defendant Board of Trustees of Jones County Junior College ("the Board") is the 20-member governing body of JCJC and is responsible for the formulation and approval of policies for the operation of the college. The Board is responsible for considering and voting upon the recommendations of the JCJC president in matters of policy. The Board approved JCJC's policies, procedures, and practices that resulted in the deprivation of the constitutional rights of Brown and YAL, and the Board knew or reasonably should have known that JCJC's policies, procedures, and practices would lead to this deprivation. Despite this knowledge, the Board was deliberately indifferent to the unconstitutionality JCJC's policies, procedures, and practices as well as the constitutional rights of Brown and YAL. At all times relevant to this

Complaint, the trustees of the Board acted under color of state law and are sued in their official capacity.

16.     Defendant Dr. Jesse Smith is, and was at all times relevant to this Complaint, the president of JCJC. Smith is the executive officer in charge of the college. Smith manages and directs all affairs of the college under policies and regulations established by the Board. Smith is responsible for the administration and enforcement of policies and regulations relating to the operation of the college. Smith is also responsible for preparing and submitting to the Board for its approval all statements of policy or programs which he believes are needed for the control and management of the college. Thus, Smith is responsible for the promulgation, implementation, and enforcement of JCJC policies, procedures, and practices, including those that were applied to deprive Brown and YAL of their constitutional rights. Smith knew or reasonably should have known that JCJC's policies, procedures, and practices would lead to this deprivation. Smith knew that individuals under his supervision implemented JCJC's policies, procedures, and practices that deprived Brown and YAL of their constitutional rights, and Smith, with deliberate indifference, failed to act with regard to the constitutional rights of Brown, YAL, and all JCJC students. At all times relevant to this Complaint, Smith acted under color of state law and is sued in his individual and official capacities.

17.     Defendant Gwen Magee is Executive Vice President of Student Affairs at JCJC. Upon information and belief, Magee held the title of Interim Vice President of Student Affairs at times relevant to this Complaint. Magee is a member of the Executive Cabinet, which advises the JCJC president on administrative procedures, policies, and operational matters. Among other duties, Magee is responsible for supervising and implementing policies and procedures for student conduct and discipline and for coordinating student activities and organizations. Thus,

Magee is responsible for the promulgation, implementation, and enforcement of JCJC policies, procedures, and practices, including those that were applied to deprive Brown and YAL of their constitutional rights. Magee knew or reasonably should have known that JCJC's policies, procedures, and practices would lead to this deprivation. Magee knew that individuals under her supervision implemented JCJC's policies, procedures, and practices that deprived Brown and YAL of their constitutional rights, and Magee, with deliberate indifference, failed to act with regard to the constitutional rights of Brown, YAL, and all JCJC students. At all times relevant to this Complaint, Magee acted under color of state law and is sued in her individual and official capacities.

18. Defendant Mark Easley is, and was at all times relevant to this Complaint, Dean of Student Affairs at JCJC. Easley is responsible for assisting and reporting to the Vice President of Student Affairs, Gwen Magee, now known as the Executive Vice President of Student Affairs. Among other duties, Easley is responsible for coordinating and supervising the areas of discipline, campus safety, student activities, clubs and organizations, and coordination of facility use. Thus, Easley is responsible for the promulgation, implementation, and enforcement of JCJC policies, procedures, and practices, including those that were applied to deprive Brown and YAL of their constitutional rights. Easley knew or reasonably should have known that JCJC's policies, procedures, and practices would lead to this deprivation. Easley knew that individuals under his supervision implemented JCJC's policies, procedures, and practices to deprive Brown and YAL of their constitutional rights, and Easley, with deliberate indifference, failed to act with regard to the constitutional rights of Brown, YAL, and all JCJC students. Easley also interfered with Brown and YAL's exercise of their constitutional rights by applying JCJC policy to Brown and YAL's constitutionally protected expression and by summoning campus police to stop Brown

and YAL from engaging in constitutionally protected speech. At all times relevant to this Complaint, Easley acted under color of state law and is sued in his individual and official capacities.

19.     Defendant Stan Livingston is, and was at all times relevant to this Complaint, the Chief of Campus Police at JCJC. Livingston is the chief law enforcement officer on the JCJC campus. Livingston is responsible for supervising and directing operations of the Campus Police Department; working with the Vice President of Student Affairs or, as she is now known, the Executive Vice President of Student Affairs and the Dean of Student Affairs in the area of campus security and safety; consulting with the Vice President of Student Affairs or, as she is now known, the Executive Vice President of Student Affairs and the Dean of Student Affairs to determine disciplinary actions concerning violations of college policy or regulations by students. Thus, Livingston is responsible for implementing and enforcing the JCJC policies, procedures, and practices that were applied to deprive Brown and YAL of their constitutional rights. Livingston knew or reasonably should have known that JCJC's policies, procedures, and practices would lead to this deprivation. Livingston knew that individuals under his supervision implemented JCJC's policies, procedures, and practices to deprive Brown and YAL of their constitutional rights, and Livingston, with deliberate indifference, failed to act with regard to the constitutional rights of Brown, YAL, and all JCJC students. Livingston interfered with Brown and YAL's exercise of their constitutional rights by applying JCJC policy to stop Brown and YAL from engaging in constitutionally protected speech. At all times relevant to this Complaint, Livingston acted under color of state law and is sued in his individual and official capacities.

**STATEMENT OF FACTS**

**A. Jones County Junior College maintains and enforces policies restricting protected expression by students and student organizations.**

20.     JCJC maintains policies in its Student Handbook that regulate the protected speech and expressive activity of students and student organizations on the JCJC campus. At the time of filing and at all times relevant to this Complaint, the 2018-2019 version of the Student Handbook is and was in force at JCJC.[1]

21.     The 2018-2019 Student Handbook (the "Student Handbook") states: "A student enrolling in the College assumes the obligation to become acquainted with the rules and regulations, and while on the campus of [JCJC] and/or off-campus as activities relate to the instructional process, is expected to conform to the standards of conduct set by the College. Violators of these standards of conduct will be subject to disciplinary action."

22.     The Student Handbook contains the College Code of Conduct (the "Conduct Code"). By the terms of the Student Handbook, all students who register at JCJC agree to comply with the Conduct Code's regulations and policies and are subject to disciplinary action for violations of the Conduct Code.

23.     The Conduct Codes lists "actions [that] are violations of college regulations." Paragraph 9 of the Conduct Code identifies "Disruptive activity" as a violation of JCJC regulations. It defines "Disruptive activity" as including "unauthorized events and activities of any and all segments of the college." (A true and correct copy of the Conduct Code, excerpted from the Student Handbook, is attached as Exhibit A.)

---

[1] A full online copy of the 2018-2019 JCJC Student Handbook may be found at https://web.archive.org/web/20190710155131/http://www.jcjc.edu/studentpolicies/docs/studenth andbook.pdf.

24.     Paragraph 17 of the Conduct Code lists "disorderly conduct," "lewd, indecent, or obscene conduct," and "public profanity on campus" as violations of JCJC regulations.

25.     The Student Handbook also contains a section titled "Student Activity Policies." Paragraph 2 of the Student Activity Policies includes a set of "Assemblies Regulations." Paragraph 2.a. of these regulations include, in relevant part, the requirement that:

> Any student parade, serenade, demonstration, rally, and/or other meeting or gathering for any purpose, conducted on the campus of the institution must be scheduled with the President or Vice President of Student Affairs at least 72 hours in advance of the event. (Forms available in Student Affairs) Names of the responsible leaders of the groups must be submitted to the institution at the time of scheduling.

(A true and correct copy of the Student Activity Policies, excerpted from the Student Handbook, is attached as Exhibit B.)

26.     Paragraph 2.b. of the Student Activity Policies states: "Students assembling for any meeting not authorized in accordance with paragraph one [indicating paragraph 2.a.] are subject to proper disciplinary action. Students present at such unauthorized meetings are considered to be participants."

27.     Under the Disciplinary Actions policy in the Student Handbook, matters subject to disciplinary action are referred to a Student Affairs Committee, which can result in suspension or recommending expulsion. The Vice President of Student Affairs is delegated the authority to impose "[d]isciplinary probation, fines, or other action" for "minor infractions in lieu of an appearance before the disciplinary committee, provided the student agrees to such action as imposed." "Disciplinary probation as imposed by the Vice President of Student Affairs may be accompanied by whatever restrictions the Vice President of Student Affairs deems necessary to impose." (A true and correct copy of the Disciplinary Actions policy, excerpted from the Student Handbook, is attached as Exhibit C.)

9

28.     Although YAL is not currently a recognized student organization at JCJC, if the organization gains status as an officially approved organization, its activities may be subject to even more onerous prior approval requirements than those imposed by the Assemblies Regulations under regulations in the Student Activity Policies applicable to student organization activities.

29.     Moreover, the regulations in the Student Activity Policies outright prohibit Brown or YAL from engaging in speech or expressive activities that are considered "student activities."

30.     Paragraph 1 of the Student Activity Policies includes a set of "Scheduling and Planning" regulations. Paragraph 1 of these regulations include, in relevant part, the requirement that:

> a. All college connected student activities conducted by a student organization at Jones County Junior College must be scheduled by the Vice President of Student Affairs. The Vice President of Student Affairs reserves the right to schedule or not schedule any activity. Where the activity is not scheduled, the sponsoring organization may request a hearing before the Student Affairs Committee. Only approved student organizations may conduct student activities on or off the campus.

> b. Permission for student activities may be obtained by completing the "Activity/Speaker Application Form" available on the myJones *Insider*. All requests are due in the Office of the Student Affairs [*sic*] five days preceding the activity. […]

31.     Under the Scheduling and Planning regulations, "[i]nfractions of the student activity policies will be referred to the Student Affairs Committee."

32.     The Student Handbook policies and regulations impose a prior restraint on all speech and expressive activity by any student or student organization anywhere on JCJC's campus.

33.     The Student Handbook policies and regulations grant JCJC administrators unfettered discretion to grant or deny a request to engage in speech or expressive activity on campus because of the content or viewpoint of the speaker's intended message.

34.     The Student Handbook policies and regulations prohibit spontaneous or anonymous speech by requiring that expressive activity be approved and scheduled, and that leaders be identified with a JCJC administrator at least three to five days in advance. Thus, under the Student Handbook, JCJC students' and student organizations' ability to respond promptly, publicly, or anonymously to current and still-unfolding events is at best severely restricted and may in fact be denied entirely.

35.     JCJC's property is made up of several hundred acres and its Ellisville campus has many open, publicly accessible areas, outdoor green spaces, sidewalks, and pedestrian plazas and thoroughfares where student speech and expressive activity would not interfere with or disturb access to college buildings or sidewalks, impede vehicular or pedestrian traffic, or disrupt campus operations or the college's educational functions. Yet, the entire campus is off-limits to any student expression without the prior approval of JCJC administrators at least three to five days ahead of time through an undefined scheduling process that grants JCJC unfettered and arbitrary discretion to prohibit student expression on the basis of content or viewpoint.

36.     Moreover, the Student Handbook's prohibition on any "student activities" by anyone but "approved student organizations" is an overbroad and vague restriction that can easily be applied to entirely prevent any kind of speech or expressive activity by non-approved student organizations or individual students.

37.     Finally, by prohibiting "public profanity" on campus, the Student Handbook imposes an overbroad, content-based restriction on speech that encompasses student expression plainly protected by the First Amendment.

**B.  Brown and YAL repeatedly attempted to engage in constitutionally protected expressive activity on campus, but were shut down pursuant to JCJC's policies and practices.**

38.     Brown has been a member of the national organization Young Americans for Liberty since August of 2018. In August 2018, he started a YAL chapter at JCJC, which he registered with the national organization and which has since appeared on a list of chapter locations in the United States on the national organization's website, https://yaliberty.org/chapters.

39.     From the time Brown started the YAL chapter until February 26, 2019, he walked around JCJC's Ellisville campus on approximately four occasions talking to fellow students about the YAL chapter and asking students to sign up to learn more about the organization. On approximately two of those occasions, he also distributed pamphlets and pocket-sized copies of the Constitution of the United States ("pocket Constitutions") to fellow students on campus.

40.     In doing so, Brown engaged in peaceful expressive activity in areas of campus accessible to all students without disruption to the educational mission or operation of the college.

41.     On or about February 26, 2019, Brown met a former JCJC student, Mitch Strider, who is also a member of YAL's national organization, on JCJC's Ellisville campus. Brown and Strider intended to recruit JCJC students to join the college YAL chapter.

42.     Brown and Strider parked behind Jones Hall, near the campus lake,[2] and inflated an oversized beach ball, which they referred to as a "free speech ball." They moved the free speech ball to a location on Centennial Plaza, a plaza in front of Jones Hall that is over three acres large, made up of large grass areas, sidewalks, and walkways. Brown and Strider placed the ball in the grass near a concrete patio in front of the main entrance on the north side of Jones Hall.

43.     For approximately one hour, Brown and Strider remained in the same location, inviting passersby to approach and write messages of their choice on the free speech ball. A number of students accepted the invitation to write messages on the ball. As they did, Brown and Strider took the opportunity to talk to them about free speech and other civil liberties issues important to YAL, and encouraged them to sign up for the chapter. Brown and Strider also carried a clipboard with a sign-up sheet to record contact information of students interested in learning more about the YAL chapter.

44.     During the approximately one hour Brown and Strider had the free speech ball at this location near the northern entrance to Jones Hall, neither they nor the free speech ball impeded ingress or egress to or from any building, disrupted pedestrian or vehicular traffic, or caused any form of disruption to the educational mission or operation of the college.

45.     After approximately one hour, Brown and Strider decided to try positioning the free speech ball at other locations around the campus. They moved the free speech ball to a location on the grass on the west side of Centennial Plaza, where they remained for approximately ten minutes. They then moved the free speech ball to a grass space next to a sidewalk adjacent to the Administration Building.

---

[2] A true and correct copy of a campus map publicly available on JCJC's website as of the date of the filing of this Complaint is attached as Exhibit D.

46.     Brown, Strider, and the free speech ball never impeded ingress or egress to or from any building, disrupted pedestrian or vehicular traffic, or caused any form of disruption to the educational mission or operation of the college.

47.     Shortly after arriving at the location adjacent to the Administration Building, Brown and Strider were approached by a JCJC staff person.

48.     The JCJC staff person asked Brown and Strider if they had obtained permission to be on campus and whether they had spoken with JCJC Dean of Students Mark Easley about their expressive activity.

49.     Shortly after being approached by the staff person, Easley and another JCJC staff member, Luke Hammonds, approached Brown and Strider.

50.     Easley informed Brown and Strider that they were not permitted to be present on campus with the free speech ball because they had not followed JCJC's policies to gain administrative approval for the activity.

51.     Although Brown informed Easley that he was a JCJC student, Easley confirmed in response to Brown's inquiry that he was not permitted to have the free speech ball on campus at any point that day because Brown had not submitted the necessary paperwork and followed the necessary procedure to do so.

52.     Easley stated that JCJC's policies and "proper" procedures must be followed in order to have the free speech ball on campus.

53.     While speaking to Brown and Strider, Easley asked for Strider's name. Strider gave his first name but declined to give Easley his last name.

54.     Easley called JCJC Chief of Campus Police Stan Livingston and requested he come to the location of the free speech ball, at that time still adjacent to the Administration Building.

55.     Easley called Livingston as a result of Brown's expressive activity on behalf of YAL.

56.     Hammonds stated loudly that the free speech ball had "profanity all over it" while Easley spoke with Livingston.

57.     While waiting for Livingston to arrive, Brown asked what would happen if he refused to remove the free speech ball from campus. Hammonds responded that they would let Livingston "handle all that."

58.     Livingston arrived at the location where Brown and Strider stood with the free speech ball less than five minutes after Easley's call.

59.     Livingston ordered Brown and Strider to accompany him to his office. He instructed Brown and Strider to leave the free speech ball next to a side entrance to the Administration Building as he led them inside the building to his office.

60.     Livingston ordered Brown and Strider to his office as a result of Brown's expressive activity on behalf of YAL.

61.     In Livingston's office, the police chief stated that he recalled speaking to Brown about his starting a club and asked if the free speech ball was related to the club.

62.     Brown responded in the affirmative and Livingston informed him that if he had an "agenda" and wanted to "do this" he needed to "clear it" with Gwen Magee—then Interim Vice President of Student Affairs—and "go through her system."

63.     Livingston then explained that Brown would need to come back the following week to meet with Magee because she was not present on campus that day.

64.     Livingston stated that Strider, as a non-student, would have to leave campus that day or risk arrest for trespass if he refused.

65.     In Brown's presence, Livingston threatened to arrest Strider as a result of Brown's expressive activity on behalf of YAL.

66.     In response to Brown's inquiries about the policies governing his obligations as a student who wished to have a free speech ball on campus, Livingston stated that Brown needed to come back later and speak with Magee to discuss what approval procedures JCJC policy required and what expressive activity Brown was permitted to engage in on campus.

67.     Livingston stated that JCJC policy could be interpreted differently by Brown or himself and acknowledged that the policy could be "ambiguous."

68.      Livingston also reiterated that Brown was not permitted to be on campus with the free speech ball until he had permission from Magee.

69.     Upon leaving Livingston's office, Brown and Strider deflated the free speech ball and departed the Ellisville campus.

70.     The actions of JCJC staff, Easley, and Livingston as described in Paragraphs 47 to 69 would have chilled a student of ordinary firmness from exercising their right to free speech.

71.     Moreover, Brown was distressed by the actions of JCJC staff, Easley, and Livingston as described in Paragraphs 47 to 69 because he felt that they inhibited his ability to recruit members for YAL.

72.     After February 26, 2019, neither Brown nor any other member of the YAL chapter or YAL's national organization have attempted to bring a free speech ball onto JCJC's

Ellisville campus or any other JCJC property for fear of disciplinary action, removal from

campus, or arrest.

73.     On or about April 4, 2019, Brown again went to the JCJC Ellisville campus with

the intention of recruiting JCJC students to join the college YAL chapter. He was joined on

campus by a staff member of the national YAL organization, Nathan Moore, who intended to

help Brown's recruitment efforts.

74.     Brown and Moore decided to stand near several large pillars on a concrete patio in

front of the main entrance on the north side of Jones Hall, at the edge of Centennial Plaza. They

were joined by Brown's girlfriend, then a JCJC student and member of the YAL chapter. Brown

held up a sign that was designed to be a poll and invited passing students to mark the sign in a

space indicating whether they thought marijuana should be illegal, legal for medical use, or legal

for recreational use. The purpose of the sign was to catch students' attention and initiate a

conversation about marijuana legalization as a means of also starting a conversation about YAL

and the organization's positions on civil liberties and the role of government. The three also

carried pamphlets and pocket Constitutions to distribute, as well as a clipboard with sign-up

sheets to record contact information of students interested in joining the YAL chapter.

75.     Shortly after arriving at their location in front of Jones Hall, Brown and Moore

were approached by two students who inquired about the sign, marked the sign to indicate their

support for recreational marijuana legalization, and started a conversation with Brown and

Moore about YAL and the issues for which the organization advocates.

76.     At no point while they were engaged in expressive activity on the Ellisville

campus on or about April 4, 2019 did Brown, his girlfriend, or Moore impede ingress or egress

to or from any building, disrupt pedestrian or vehicular traffic, or cause any form of disruption to the educational mission or operation of the college.

77.     While Brown and Moore spoke to the students who had approached them, Hammonds walked past and entered Jones Hall.

78.     Hammonds exited Jones Hall several minutes later and noticed Brown.

79.     Hammonds approached and asked what Brown and Moore were doing.

80.     Brown explained that they were trying to start conversations with students in order to talk about civil liberties and the government.

81.     Hammonds asked Brown if he was the same person who had been on campus at an earlier date with a beach ball.

82.     When Brown confirmed that he was the person with the beach ball, Hammonds asked if Brown had spoken to Livingston about his activity on campus that day, on or about April 4, 2019.

83.     Brown responded that he had not spoken to Livingston.

84.     Hammonds then called JCJC campus police and requested that an officer come to the location where Brown, his girlfriend, and Moore stood.

85.     Hammonds called JCJC campus police as a result of Brown's expressive activity.

86.     After Hammonds called the JCJC campus police, the students who had been speaking to Brown and Moore about YAL and marijuana legalization walked away.

87.     Hammonds accompanied Brown, his girlfriend, and Moore inside the lobby of Jones Hall to await campus police. After approximately five minutes, JCJC campus police officer Kim Dikes arrived.

88.     Dikes asked what Brown, his girlfriend, and Moore were doing.

89.     Brown attempted to explain the purpose of the expressive activity they had been engaged in before their interruption by Hammonds.

90.     Dikes responded that they were not permitted to engage in such activity on campus without prior administrative permission.

91.     Brown asked Dikes what policy they had violated by their actions. Dikes responded, "That's illegal, first of all, and you're on a school campus."

92.     Dikes then escorted Brown and his girlfriend further inside Jones Hall and asked for their drivers' licenses and student identification cards.

93.     Dikes wrote down their names, phone numbers, addresses, and student identification numbers.

94.     While Dikes was recording Brown and his girlfriend's personal information, Livingston arrived at Jones Hall.

95.     Livingston asked what was going on and chastised Brown, stating that he already knew he was not allowed to engage in such activity on campus without administrative permission.

96.     Livingston instructed Dikes to take Brown and his girlfriend to his office in the Administration Building while he escorted Moore to his vehicle.

97.     Livingston insisted that Moore follow him out of the building.

98.     As they walked out of the building, Livingston told Moore that he was interrupting "the education process."

99.     Outside Jones Hall, Livingston asked Moore to see his driver's license. Moore did not provide his license and asked if he was being detained.

100.    Livingston then instructed Moore to leave campus and stated that he would arrest Moore if he returned to the college again.

101.    Livingston threatened to arrest Moore as a result of his and Brown's expressive activity.

102.    Moore returned to his vehicle and departed the campus.

103.    Moore informed Brown later that day, on or about April 4, 2019, that Livingston had threatened him with arrest if he returned to the Ellisville campus.

104.    While Livingston escorted Moore out of Jones Hall, Dikes took Brown and his girlfriend to Livingston's office in the Administration Building.

105.    Dikes waited in the office with Brown and his girlfriend until Livingston arrived.

106.    When Livingston arrived in his office, he told Brown he was "smarter than that" and knew he was not allowed to engage in expressive activity on campus without administrative approval. Livingston told Brown he could not be on campus "interrupting the education process."

107.    Livingston accused Brown of trying to make him "look like a fool."

108.    Brown argued that he had assumed it was the presence of the free speech ball that prompted JCJC administrators and police to stop his expressive activity in February 2019, and he had not understood that he needed prior administrative permission to simply engage fellow students in conversation.

109.    Livingston insisted that Brown must go through Magee's "process" before engaging in any expressive activity on campus.

110.    Livingston then told Brown not to cause any more "trouble" before the end of the semester.

111.   Livingston invited Easley to come to his office to talk to Brown and his girlfriend.

112.   Easley entered the office and confirmed that Brown and YAL were not permitted to engage in expressive activity on campus of the type they were engaged in that day, on or about April 4, 2019, without administrative approval.

113.   Easley reiterated that Brown and YAL must speak to and obtain approval from Magee before conducting any "events" on campus.

114.   The actions of Hammonds, Dikes, Easley, and Livingston as described in Paragraphs 79 to 113 would have chilled a student of ordinary firmness from exercising their right to free speech.

115.   Moreover, Brown was intimidated and distressed by the actions of Hammonds, Dikes, Easley, and Livingston as described in Paragraphs 79 to 113 and he felt that they inhibited his ability to recruit members for YAL.

116.   Despite the fact that Brown continued as a student at JCJC throughout the 2019 spring and summer semesters, neither he nor any other member of the YAL chapter or YAL's national organization have engaged in expressive activity on the Ellisville campus or any other JCJC property since April 4, 2019, for fear of disciplinary action, removal from campus, or arrest.

117.   Defendants' policies, practices, and actions regarding student speech and expressive activity on campus have a chilling effect on Brown's and YAL's rights and the rights of all other JCJC students and student organizations to engage freely and openly in speech and expressive activity.

118.   YAL wishes to engage in expressive activity at JCJC without seeking prior administrative approval and without having to wait at least three to five days in order to do so.

However, based on Brown's, other YAL members', and potential YAL members' interactions with JCJC administrators and police officers, as described in this Complaint, they are reasonably afraid of being punished, detained, or removed from campus if they do so.

## CAUSES OF ACTION

## <u>FIRST CAUSE OF ACTION</u>

**Freedom of Speech Under
the First and Fourteenth Amendments (42 U.S.C. § 1983)
Facial Challenge to JCJC Policies and Procedures Governing Student Expression
(Against Defendants Board of Trustees of Jones County Junior College,
Smith, Magee, Easley, and Livingston)**

119.     Plaintiffs repeat and reallege each of the foregoing paragraphs in this Complaint.

120.     The First and Fourteenth Amendments extend to the campuses of public colleges and universities such as JCJC. *See Widmar*, 454 U.S. at 268 (noting that "[w]ith respect to persons entitled to be there, our cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities"); *see also Healy*, 408 U.S. at 180.

121.     To pass constitutional muster under the First Amendment, time, place, and manner restrictions on speech must be reasonable, "justified without reference to the content of the regulated speech," "narrowly tailored to serve a significant governmental interest," and formulated to "leave open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). This includes restrictions on student speech on a public college campus like JCJC. *See, e.g., Shaw v. Burke*, No. 2:17-CV-02386-ODW, 2018 U.S. Dist. LEXIS 7584, at *25 (C.D. Cal. Jan. 17, 2018) (finding that the outdoor areas of a public community college campus are traditional public fora and applying a public forum time, place, and manner analysis to policies restricting student speech).

122.    The JCJC Student Handbook policies impose unreasonable restrictions on student and student organization speech and expressive activity by requiring prior administrative approval for all speech anywhere on campus. The Student Handbook policies prohibiting "unauthorized events and activities"; requiring that "[a]ny student parade, serenade, demonstration, rally, and/or other meeting or gathering for any purpose" on campus be scheduled with JCJC administrators 72 hours in advance; requiring that "[a]ll college connected student activities conducted by a student organization" be scheduled with JCJC administrators five days in advance; and prohibiting non-approved student organizations from conducting "student activities" on or off campus all represent speech restrictions that are not narrowly tailored, do not serve a significant government interest, do not allow ample alternative channels for communication, and are impermissibly vague and overbroad.

123.    Further, the Student Handbook policies and the undefined administrative approval procedures described above impose a prior restraint on the freedom of expression of Plaintiffs and all JCJC students and student organizations.

124.    On their face, the Student Handbook policies described above fail to provide the constitutionally-required "narrow, objective, and definite standards," *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969), which "provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech . . . ." *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988). These policies therefore allow for unfettered administrative discretion because they lack the narrow, objective, and definite standards that would prevent viewpoint-discriminatory application and would allow a court to determine whether they are being used to censor speech of which Defendants disapprove. "[T]he mere existence of . . . unfettered discretion, coupled with the

power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id*. at 757.

125.     The lack of narrow, objective, and definite standards guiding JCJC officials' discretion is evidenced by Easley and Livingston's repeated instructions to Brown that he was required to go through Magee and submit to undefined "procedures" in order to engage in any expressive activity anywhere on campus.

126.     By requiring students and student organizations to identify themselves through the administrative approval process, the Student Handbook policies described above prohibit students from engaging in anonymous speech. *Watchtower Bible and Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 167 (2002).

127.     By requiring prior administrative approval for any speech or expressive activity on campus, prohibiting "unauthorized events and activities," and prohibiting non-approved student organizations from conducting "student activities" on or off campus, the Student Handbook policies described above unconstitutionally prohibit students and student organizations from engaging in spontaneous expression.

128.     Further, the Student Handbook's prohibition on "public profanity" is an overbroad restriction on the content of student and student organization speech. Profanity on its own is protected by the First Amendment under well-established law. *See Cohen v. California*, 403 U.S. 15 (1971). This is no less true on a public college campus. *See Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) ("[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'"). The Student Handbook's prohibition on "public

profanity" therefore purports to ban speech that is protected under the First Amendment to the Constitution.

129.    Under the terms of the Student Handbook, the violation of any policy described above can subject a student or student organization to disciplinary action up to and including suspension or expulsion, or may result in disciplinary probation including restrictions that are at the sole discretion of the Vice President of Student Affairs.

130.    Defendant Board of Trustees of JCJC is responsible for the formulation, approval, and maintenance of all JCJC policies for operation of the college, including those that directly resulted in the deprivation of Plaintiffs' and other JCJC students' constitutional rights under the First Amendment to the Constitution, as applied to the states by the Fourteenth Amendment and 42 U.S.C. § 1983.

131.    Defendants Smith, Magee, Easley, and Livingston possess administrative and enforcement authority over JCJC's policies, regulations, and procedures and are responsible for the implementation and enforcement of the Student Handbook policies, which directly resulted in the deprivation of Plaintiffs' constitutional rights under the First Amendment to the Constitution, as applied to the states by the Fourteenth Amendment and 42 U.S.C. § 1983. Defendants knew that individuals under their supervision implemented JCJC's policies, procedures, and practices to deprive Brown and YAL of their constitutional rights, and Defendants, with deliberate indifference, failed to act with regard to the constitutional rights of Brown and YAL.

132.    Defendant Smith is additionally responsible for preparing and submitting to the Board for its approval all statements of policy or programs which he believes are needed for the control and management of the college.

133.    By maintaining and enforcing the Student Handbook policies described in this Complaint, Defendants Smith, Magee, Easley, and Livingston are responsible for the deprivation of Plaintiff's clearly established constitutional rights, of which any reasonable college official should have been aware, rendering them liable to Plaintiffs under 42 U.S.C. § 1983.

134.    The denial of constitutional rights is an irreparable injury *per se*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and Plaintiffs are entitled to declaratory and injunctive relief, damages in an amount to be determined by this Court, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

### SECOND CAUSE OF ACTION

**Freedom of Speech Under
the First and Fourteenth Amendments (42 U.S.C. § 1983)
As-Applied Challenge to JCJC Policies and Procedures Governing Student Expression
(Against Defendants Board of Trustees of Jones County Junior College,
Smith, Magee, Easley, and Livingston)**

135.    Plaintiffs repeat and reallege each of the foregoing paragraphs in this Complaint.

136.    Defendants Easley and Livingston enforced JCJC policies and procedures governing student expression against Brown and YAL on or about February 26, 2019, and April 4, 2019, in violation of their rights under the First Amendment. On both occasions, JCJC administrators and police officers, including Easley and Livingston, forced Brown and others engaged in speech and expressive activity on the Ellisville campus on behalf of YAL to cease their peaceful, non-disruptive activity. On both occasions, Brown was forced to meet with Livingston, the chief campus law enforcement officer, in his office; was informed by Livingston and Easley that JCJC policies and procedures prevented him and YAL from continuing to engage in expressive activity on campus; and was told by Livingston and Easley that he was required to meet with and gain permission from Magee prior to engaging in further expressive activity on

campus. On both occasions, it was either implied or explicitly stated that Brown or others acting on behalf of YAL would be removed from the Ellisville campus by campus law enforcement if they refused to cease their expressive activity.

137.    The actions of Hammonds, Easley, Livingston, and Dikes—the latter acting at Livingston's direction—chilled Brown's and YAL's expression and violated their clearly established rights to freedom of speech and expression secured by the First Amendment to the Constitution, as applied to the states by the Fourteenth Amendment and 42 U.S.C. § 1983.

138.    Defendants Smith, Magee, Easley, and Livingston have administrative and enforcement authority over JCJC's policies and practices governing student speech and expressive activity on JCJC's Ellisville campus. As described above, they are each responsible for the implementation, or supervising the implementation of, the policies and procedures that were applied to deprive Plaintiffs of their constitutional rights. Defendant Smith is additionally responsible for preparing and submitting to the Board for its approval all statements of policy or programs which he believes are needed for the control and management of the college. Defendants knew or should reasonably have known that their actions and inactions would lead to the deprivation of clearly established student rights to freedom of speech and expression secured by the First and Fourteenth Amendments in the manner experienced by Plaintiffs. Moreover, Defendants failed to supervise their subordinates to ensure that Brown and YAL were not deprived of their constitutional rights, and Defendants failed to act, with deliberate indifference to the constitutional rights of Brown and YAL.

139.    Defendant Board of Trustees of JCJC is responsible for the formulation, approval, and maintenance of all JCJC policies for operation of the college, including those that were

applied to deprive of Plaintiffs of their constitutional rights under the First Amendment to the
Constitution, as applied to the states by the Fourteenth Amendment and 42 U.S.C. § 1983.

140.   Defendants Smith, Magee, Easley, and Livingston violated Plaintiffs' clearly
established constitutional rights, of which any reasonable college official or police officer should
have known, rendering them liable to Plaintiffs under 42 U.S.C. § 1983.

141.   The denial of constitutional rights is an irreparable injury *per se*, and Plaintiffs are
entitled to declaratory and injunctive relief, damages in an amount to be determined by this
Court, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

## THIRD CAUSE OF ACTION

### First Amendment Retaliation Under 42 U.S.C. § 1983

### (Against Defendant Livingston)

142.   Plaintiffs repeat and reallege each of the foregoing paragraphs in this Complaint.

143.   Livingston's actions in ordering Brown, Brown's girlfriend, Strider, and Moore to
stop their expressive conduct and ordering Brown, Brown's girlfriend, and Strider to come to or
be taken by police to his office were retaliatory actions against Brown as a direct and proximate
result and in retaliation for his exercise of First Amendment protected freedom of speech, as
more fully discussed above.

144.   Moreover, Livingston's threats to arrest Strider and Moore were retaliatory
actions against Brown as a direct and proximate result and in retaliation for his exercise of First
Amendment protected freedom of speech, as more fully discussed above.

145.   Livingston cannot identify any non-retaliatory reason for the actions described in
Paragraphs 143–144.

28

146.    The actions of Livingston described in Paragraphs 143–144 chilled Brown's exercise of his right to engage in expressive First Amendment activity.

147.    The actions of Livingston described in Paragraphs 143–144 would chill any student of ordinary firmness from exercising their right to engage in expressive First Amendment activity.

148.    Plaintiff's constitutional right to freedom of speech has been denied under the First Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

149.    Livingston violated Brown's clearly established constitutional rights, of which any reasonable college official or police officer should have known, rendering him liable to Brown under 42 U.S.C. § 1983.

150.    As a direct and proximate cause of Livingston's actions, Brown has suffered emotional distress, humiliation, embarrassment, and injury to his reputation.

151.    As a direct and proximate result of Livingston's actions as described above, Brown was deprived of his constitutional rights. As a legal consequence of Livingston's violation of Brown's First and Fourteenth Amendment rights, which are irreparable injuries *per se*, Brown is entitled to declaratory and injunctive relief, damages, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

### FOURTH CAUSE OF ACTION

#### *Monell* Claim Under 42 U.S.C. § 1983
#### (Against Defendant Jones County Junior College)

152.    Plaintiffs repeat and reallege each of the foregoing paragraphs in this Complaint.

153.    A government body such as JCJC may be held liable under 42 U.S.C. § 1983 when the execution of government policy or custom that may be fairly said to represent its official policy inflicts injury on a plaintiff. Section 1983 also allows liability for constitutional

violations committed by government employees if the government body itself is responsible for causing constitutional deprivations. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). *Monell* liability can further rest on ratification by a final policymaker, or for damages caused by a failure to train employees that leads to the deprivation of constitutional rights.

154.    Defendant JCJC promulgated, maintains, and enforces policies and procedures, as described above, which violate student and student organization rights under the First Amendment on their face and as they were applied to violate Plaintiff's constitutional rights. JCJC was aware of its policies, procedures, and practices, and these policies, procedures, and practices were the moving force leading to the deprivation of the constitutional rights of Brown and YAL, as described below. Despite knowledge of its policies, procedures, and practices, JCJC was deliberately indifferent to the unconstitutionality of those policies, procedures, and practices as well as the constitutional rights of Brown and YAL.

155.    Defendants Easley and Livingston were acting under color of official authority pursuant to JCJC's official policies and procedures when they prevented Plaintiffs from engaging in speech and expressive activity on the Ellisville campus, in violation of their constitutional rights.

156.    Defendant JCJC failed to supervise or discipline its administrators and employees for unlawfully interfering with the First Amendment rights of Plaintiffs as well as other JCJC students and student organizations to engage in expressive activities in the public areas of a public college campus. This failure is systemic and pervades the restrictive policies maintained in the Student Handbook as well as the clear custom practiced by JCJC administrators and police officers to force students and student organizations into an undefined process of gaining administrative approval prior to engaging in any speech anywhere on campus.

157.    Defendant JCJC failed to train its administrators and employees adequately with respect to the First Amendment rights of college students and student organizations on a public campus, displaying deliberate indifference to the potential violation of Plaintiffs' and the whole student body's constitutional rights.

158.    As a direct and proximate result of JCJC's policies, customs, and practices, as described above, Plaintiffs were deprived of their constitutional rights. As a legal consequence of the Defendants' violation of Plaintiffs' First and Fourteenth Amendment rights, which are irreparable injuries *per se*, Plaintiffs are entitled to declaratory and injunctive relief, damages, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

## FIFTH CAUSE OF ACTION

**Declaratory Relief and Injunction (28 U.S.C. § 2201, *et seq.*)**
**(Against All Defendants)**

159.    Plaintiffs repeat and reallege each of the foregoing paragraphs in this Complaint.

160.    An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning Plaintiff's rights under the Constitution of the United States. A judicial declaration is necessary and appropriate at this time as to the First, Second, and Third Causes of Action above.

161.    Plaintiffs desire a judicial determination of their rights against Defendants as they pertain to Plaintiff's right to engage in speech and expressive activity in the generally accessible areas of JCJC without being subjected to an unconstitutional prior restraint or unreasonable "time, place, and manner" regulations, which are not narrowly tailored to serve a substantial government interest, and which do not leave open alternative channels of communication; and with respect to their right to be free of unconstitutionally overbroad, vague, or content-based restrictions on their speech and expressive activity.

162.     To prevent further violation of Plaintiffs' constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment issue, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring JCJC's policies and practices unconstitutional.

163.     Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, it is appropriate and hereby requested that this Court issue a permanent injunction prohibiting Defendants from enforcing their restrictions on Plaintiffs' expressive activities to the extent they are unconstitutional, so as to prevent an ongoing violation of Plaintiffs' constitutional rights.

164.     Plaintiffs and their fellow students and student organizations are suffering from irreparable harm from continued enforcement of JCJC's unconstitutional policies and practices. Monetary damages are inadequate to remedy the harm suffered as a result of the deprivation of rights under the First and Fourteenth Amendments, and the balance of equities and public interest both favor a grant of injunctive relief.

## JURY TRIAL

165.     Plaintiffs demand a trial by jury on all claims triable by a jury in this lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Brown and YAL respectfully requests that the Court enter judgment against Defendants and provide Plaintiffs the following relief:

A.  A declaratory judgment stating that JCJC's policies as described in this Complaint are unconstitutional facially and as-applied and that they violate Plaintiffs' rights as guaranteed under the First and Fourteenth Amendments to the Constitution of the United States. Specifically, Plaintiffs seek a declaratory ruling that:

1.     The JCJC Student Handbook provisions establishing prior restraints on the speech and expressive activity of students and student organizations,

including Paragraph 9 of the Conduct Code and Paragraphs 1 and 2 of the

Student Activity Policies, are invalid on their face under the First and

Fourteenth Amendments;

2. The JCJC Student Handbook provision prohibiting "public profanity on

campus" is invalid on its face under the First and Fourteenth

Amendments; and

3. JCJC's policies and practices restricting speech and expressive activity by

students and student organizations have been applied so as to deprive

Plaintiffs of their First and Fourteenth Amendment rights;

B. A permanent injunction restraining the enforcement of Defendants' unconstitutional

policies and practices;

C. Monetary damages in an amount to be determined by the Court to compensate

Plaintiffs for Defendants' unconstitutional interference with their rights under the

First and Fourteenth Amendments to the Constitution of the United States;

D. Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees, in

accordance with 42 U.S.C. § 1988 and other applicable law; and

E. All other further relief to which Plaintiffs may be entitled.

DATED:  September 3, 2019                    Respectfully Submitted:

/s/ Cody W. Gibson /s/
CODY W. GIBSON (Miss. Bar No. 103967)
Gibson & Mullennix PLLC
405 Tombigbee Street
Jackson, MS 39201
Tel: (601) 948-9840
Fax: (601) 969-7514
cwgibsonlaw@gmail.com

MARIEKE TUTHILL BECK-COON
GREG HAROLD GREUBEL
(subject to admission *pro hac vice*)
Foundation for Individual Rights in Education
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (215) 717-3440
marieke@thefire.org
greg.greubel@thefire.org

*Attorneys for Plaintiffs J. Michael Brown and
Young Americans for Liberty at Jones County
Junior College*