# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# EASTERN DIVISION

| | |
|---|---|
| J. MICHAEL BROWN; YOUNG AMERICANS FOR LIBERTY AT JONES COUNTY JUNIOR COLLEGE,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>JONES COUNTY JUNIOR COLLEGE; BOARD OF TRUSTEES OF JONES COUNTY JUNIOR COLLEGE; JESSE SMITH, in his individual and official capacities; MARK EASLEY, in his individual and official capacities; GWEN MAGEE, in her individual and official capacities; and STAN LIVINGSTON, in his individual and official capacities,<br><br>　　　　Defendants. | Civ. A. No. 2:19–cv–00127–KS–MTP |

## THE UNITED STATES OF AMERICA'S STATEMENT OF INTEREST

The United States of America respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General to send his officers "to any . . . district in the United States to attend to the interests of the United States in a suit pending in a court of the United States."[1]

## PRELIMINARY STATEMENT

Imagine a society in which a citizen must petition the government for permission to meet with his fellow citizens. Imagine further that such requests must be made at least three days in advance of the requested meeting, and that the government has unbridled discretion to determine who may meet with whom, and about what they might speak. Such extreme preconditions to speech might not be out of place in Oceania, the fictional dystopian superstate in George Orwell's *Nineteen Eighty-Four*. The First Amendment to the United States Constitution, however, ensures that preconditions like these have no place in the United States of America.

The First Amendment notwithstanding, Defendant Jones County Junior College (JCJC)—a public, Ellisville-based two-year institution of higher education whose property spans several hundred acres (Doc. 1 ("Compl.") ¶¶ 14, 35)—provides in its Student Handbook that "[a]ny . . . meeting or gathering for any purpose . . . conducted on the campus of the institution must be scheduled with the President or Vice President of Student Affairs at least 72 hours in advance of the event." (*Id.* ¶ 25; Doc. 1–3 at 112, § 2.a.) The Student Handbook further provides that "[t]he Vice President of Student Affairs reserves the right to schedule or not schedule any activity." (Compl. ¶ 30; Doc. 1–3 at 111, § 1.a.) And "[s]tudents assembling for

---

[1] "Courts have interpreted 28 U.S.C. § 517 broadly and have generally denied motions to strike statements of interest." *Gil v. Winn Dixie Stores, Inc.*, 242 F. Supp. 3d 1315, 1317 (S.D. Fla. 2017). "The statute contains no time limitation and does not require the Court's leave." *Karnoski v. Trump*, No. 18–51013, 2018 WL 4501484, at *2 (E.D. Mich. Sept. 20, 2018).

any meeting not authorized . . . are subject to proper disciplinary action," which could include repercussions as severe as expulsion. (Compl. ¶¶ 26–27; Doc. 1–3 at 112, § 2.b; Doc. 1–4 at 97.)

As alleged, these draconian regulations are no mere paper tigers: JCJC enforces them to the extreme. According to the Complaint, a JCJC official called the campus police on Plaintiff J. Michael Brown, then a JCJC student, for—ironically—speaking with other students on campus about free speech and other civil liberties, without prior permission from the administration. (*See generally* Compl. ¶¶ 38–72.) Later, another campus official called the campus police on Mr. Brown and his girlfriend as they engaged with fellow students about marijuana legalization. (*See generally id.* ¶¶ 73–116.) After these interactions, Mr. Brown stopped "engag[ing] in expressive activity" on JCJC property "for fear of disciplinary action, removal from campus, or arrest." (*Id.* ¶ 116.)

Although JCJC and its affiliated defendants have moved to dismiss Plaintiffs' claims (Docs. 14 & 15), they tellingly make no effort to reconcile JCJC's speech policies with the First Amendment. Instead, they merely argue that Plaintiffs have not demonstrated standing, that Plaintiffs have "not alleged any appreciable damages," and that the individual defendants are entitled to qualified immunity. (Doc. 15 at 1.)

The United States takes no position on these issues. But regardless of whether this particular case may proceed, JCJC, as a public institution of higher education, has a freestanding obligation to comply with the First Amendment. As explained below, JCJC's speech policies do not pass First Amendment muster in at least two major respects: they operate as a prior restraint on all student speech and contain no exception for individuals or small groups; and they further grant school officials unbridled discretion to determine which students may speak, and about what they might speak.

No matter the outcome of its pending motion to dismiss, JCJC would be wise to revisit and revise its speech policies at the earliest possible opportunity.  The Constitution demands nothing less.

## INTEREST OF THE UNITED STATES

The right to free speech lies at the heart of a free society.  The United States accordingly has a substantial interest in the freedom of speech.  Earlier this year, the President issued an executive order stating that "[f]ree inquiry is an essential feature of our Nation's democracy, and it promotes learning, scientific discovery, and economic prosperity."  Exec. Order No. 13,864, 84 Fed. Reg. 11,401 (Mar. 21, 2019).  For this reason, it is the policy of the Executive Branch "to promote free and open debate on college and university campuses."  *Id.*  "We must encourage institutions," the order continues, "to appropriately account for this bedrock principle in their administration of student life and to avoid creating environments that stifle competing perspectives, thereby potentially impeding beneficial research and undermining learning."  *Id.*

The United States has a particularly strong interest in ensuring that the First Amendment freedoms to speak and assemble are recognized by public institutions of higher education.  The United States, through the U.S. Department of Education, has made federal taxpayer-funded grants to JCJC in the past and may well do so again in the future.  Also, the United States, through the U.S. Department of Education and other agencies, obligates billions of federal taxpayer dollars in grants to public institutions of higher education annually, and it has a compelling interest in ensuring that grant recipients comply with the Constitution and other relevant federal laws.

Finally, the Attorney General enforces 34 U.S.C. § 12601, which provides in relevant part that governmental authorities and their agents may not "engage in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities

3

secured or protected by the Constitution or laws of the United States." § 12601(a). The Attorney General "may in a civil action obtain the appropriate equitable and declaratory relief to eliminate the pattern or practice." § 12601(b).

## BACKGROUND

A.  **JCJC's Student Handbook and Its College Code of Conduct**

JCJC's Student Handbook and its College Code of Conduct contain regulations and policies that all JCJC students must follow. (Compl. ¶ 22.) Students found violating these regulations and policies face disciplinary action that can include fines, suspension, and expulsion. (*Id.* ¶ 27.)

The "Assemblies Regulations" in JCJC's Student Activity Policies provide in part that "[a]ny student parade, serenade, demonstration, rally, and/or *other meeting or gathering for any purpose*, conducted on the campus of the institution must be scheduled with the President or Vice President of Student Affairs at least 72 hours in advance of the event." (*Id.* ¶ 25 (emphasis added); Doc. 1–3 at 112, § 2.a.) The Assemblies Regulations provide no standards to be applied by the President or Vice President in determining whether to schedule meetings and gatherings. In fact, the Scheduling and Planning section of the Student Activity Policies states that "[t]he Vice President of Student Affairs reserves the right to schedule or not schedule any activity." (Compl. ¶ 30; Doc. 1–3 at 111, § 1.a.)

The Assemblies Regulations further provide that "[s]tudents assembling for any meeting not authorized in accordance with [the Scheduling and Planning section]"—including students who are merely "present at such unauthorized meetings"—"are subject to proper disciplinary action." (Compl. ¶ 26; Doc. 1–3 at 112, § 2.b.) The Disciplinary Actions section of the Student Handbook states that "[d]isciplinary probation, fines, or other action may be imposed by the Vice President of Student Affairs or his designee when involving minor infractions in lieu of an

appearance before the disciplinary committee, *provided* the student *agrees* to such action as imposed." (Compl. ¶ 27; Doc. 1–4 at 97 (emphases added).) Discipline may also include suspension and expulsion. (*Id.*)

**B.     The Alleged Ramifications of Unauthorized Speech on JCJC's Campus[2]**

Plaintiff J. Michael Brown was a student enrolled at JCJC between August 2018 and August 2019. (Compl. ¶¶ 12, 116.) In August 2018, Brown founded a JCJC chapter of Young Americans for Liberty (YAL), a libertarian youth advocacy organization with chapters on college campuses nationwide. (*Id.* ¶¶ 13, 38.)

   *1.     The "Free Speech Ball" Incident*

Mr. Brown's first run-in with the JCJC police occurred in February 2019, when Mr. Brown and a former JCJC student, Mitch Strider, sought to speak with JCJC students about YAL's mission in an effort to recruit new student members. (*Id.* ¶ 41.) They brought an oversized beach ball, which they referred to as a "free speech ball," to Centennial Plaza, JCJC's open central quadrangle. (*Id.* ¶¶ 42–43; *see* Doc. 1–5.) On the quadrangle, they invited passing students to write messages on the free speech ball, engaged them about YAL's issues, and encouraged them to sign up for the YAL chapter. (Compl. ¶ 43.) Mr. Brown and Mr. Strider then moved the free speech ball to a grassy area of the quadrangle next to the Administration Building. (*Id.* ¶ 45.) None of their activities impeded traffic or building access, or in any other way disrupted JCJC's operations. (*Id.* ¶¶ 44, 46.)

While Mr. Brown and Mr. Strider were at the grassy area, a JCJC staff member approached and asked them "if they had obtained permission to be on campus and whether they

---

[2]     At this stage of litigation, the United States, like Defendants (*see* Doc. 15 at 1 n.1), assumes the veracity of Plaintiffs' well-pled allegations.

had spoken with JCJC Dean of Students Mark Easley about their expressive activity." (*Id.* ¶ 48.) Dean Easley arrived soon afterwards and "informed Brown and Strider that they were not permitted to be present on campus with the free speech ball because they had not followed JCJC's policies to gain administrative approval for the activity." (*Id.* ¶ 50.) "Although Brown informed Easley that he was a JCJC student, Easley confirmed in response to Brown's inquiry that he was not permitted to have the free speech ball on campus at any point that day because Brown had not submitted the necessary paperwork and followed the necessary procedure to do so." (*Id.* ¶ 51.)

Dean Easley then called JCJC Chief of Campus Police Stan Livingston to the scene. (*Id.* ¶ 54.) Police Chief Livingston "ordered Brown and Strider to accompany him to his office." (*Id.* ¶ 59.) "In response to Brown's inquiries about the policies governing his obligations as a student who wished to have a free speech ball on campus, Livingston stated that Brown needed to come back later and speak with" the then-Interim Vice President of Student Affairs "to discuss what approval procedures JCJC policy required and what expressive activity Brown was permitted to engage in on campus." (*Id.* ¶ 66; *see id.* ¶ 62.) Police Chief Livingston "also reiterated that Brown was not permitted to be on campus with the free speech ball until he had permission" from the Interim Vice President. (*Id.* ¶ 68.) "Upon leaving Livingston's office, Brown and Strider deflated the free speech ball and departed [JCJC's] Ellisville campus." (*Id.* ¶ 69.)

    2.    *The Marijuana-Legalization Incident*

Mr. Brown's second run-in with the JCJC police occurred in April 2019 when Mr. Brown, his girlfriend (who was then also a JCJC student), and a YAL staff member were on campus to speak with students about YAL's mission in an attempt to recruit students to the YAL chapter. (*Id.* ¶¶ 73-74.) They stood on the edge of the quadrangle, and Mr. Brown held a sign inviting students to share their views on marijuana legalization. (*Id.* ¶ 74.) The three also carried

6

pamphlets and pocket Constitutions to distribute to interested students.  (*Id.*)  Their activities at the quadrangle did not impede any traffic or building access, or in any other way disrupt JCJC's operations.  (*Id.* ¶ 76.)

While the group was speaking with two students, a JCJC staff member approached and asked if Mr. Brown had been on campus earlier with a beach ball.  (*Id.* ¶¶ 74–81; *see id.* ¶ 49.)  After Mr. Brown confirmed that he had been on campus with a beach ball, the JCJC staff member called the campus police.  (*Id.* ¶ 84.)  The students who had been speaking with Mr. Brown walked away.  (*Id.* ¶ 86.)

Eventually, JCJC Police Officer Kim Dikes arrived.  (*Id.* ¶ 87.)  When Mr. Brown "attempted to explain the purpose of the expressive activity they had been engaged in," Police Officer Dikes responded "that they were not permitted to engage in such activity on campus without prior administrative permission."  (*Id.* ¶¶ 89–90.)  Police Officer Dikes then asked Mr. Brown and his girlfriend for their drivers' licenses and student identification cards, and took down their names, phone numbers, addresses, and student identification numbers.  (*Id.* ¶¶ 92–93.)

Police Officer Dikes then took Mr. Brown and his girlfriend to Police Chief Livingston's office.  (*Id.* ¶¶ 104–05.)  When Police Chief Livingston arrived, he told Mr. Brown that he "knew he was not allowed to engage in expressive activity on campus without administrative approval."  (*Id.* ¶ 106.)  Police Chief Livingston also told Mr. Brown "not to cause any more 'trouble' before the end of the semester."  (*Id.* ¶ 110.)

Neither Mr. Brown "nor any other member of the YAL chapter or YAL's national organization have engaged in expressive activity on the Ellisville campus or any other JCJC property since April 4, 2019, for fear of disciplinary action, removal from campus, or arrest."  (*Id.* ¶ 116.)

## **ARGUMENT**

College campuses should not be mini police states. And the First Amendment, which provides that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend. I, ensures that public colleges *cannot* be police states. *See also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) ("the Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States").

The Supreme Court has explained that its cases "leave no doubt that," "[w]ith respect to persons entitled to be there," "the First Amendment rights of speech and association extend to the campuses of state universities." *Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981). Indeed, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," as "[t]he college classroom with its surrounding environs is peculiarly the marketplace of ideas." *Healy v. James*, 408 U.S. 169, 180 (1972) (internal quotation marks omitted).[3]

The First Amendment allows public colleges to impose reasonable restrictions on the time, place, and manner of protected speech. But such restrictions: (i) must be "justified without reference to the content of the regulated speech"; (ii) must be "narrowly tailored to serve a significant governmental interest"; and (iii) must "leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks omitted). Even content-neutral restrictions cannot "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.*

---

[3] College campuses may be able to impose more-restrictive conditions on persons *not* "entitled to be there." *Widmar v. Vincent*, 454 U.S. at 268–69. *Cf. Sonnier v. Crane*, 613 F.3d 436, 438 (5th Cir. 2010) (discussing campus speech restrictions as applied to "non-students"), *withdrawn in part*, 634 F.3d 778 (5th Cir. 2011) (per curiam). This action, however, concerns student speech.

at 799.  Like any government entity, when a public college "restricts speech, [it] bears the burden of proving the constitutionality of its actions."  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000).

JCJC's speech policies violate the First Amendment in at least two significant respects.  *First*, JCJC's speech policies act as an unflinching prior restraint on all student speech, and contain no exception for individuals or small groups that are unlikely to tread upon a legitimate school interest.  *Second*, JCJC's speech policies grant school officials unbridled discretion to determine which students may speak, and about what they might speak.

A.      **JCJC's Unconstitutional Prior Restraint on All Student Speech**

"It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so."  *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 165–66 (2002).  "Regulations that require speakers to obtain permits before speaking—prior restraints—are disfavored and must be confined by narrow, objective, and definite standards."  *Serv. Emps. Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) (internal quotation marks omitted).  "There is a 'heavy presumption' of invalidity for prior restraints that grant the licensing authority broad discretion."  *Id.* (quoting *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992)).  The government "carries a heavy burden of showing justification for the imposition of such a restraint."  *Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1305 (1983) (internal quotation marks omitted).

JCJC's speech policies act as an unflinching prior restraint on student speech, and contain no exception for individuals or small groups.  JCJC's speech policies require three days' notice and administrator approval of "any student . . . meeting or gathering for any purpose, conducted

9

on the campus." (Compl. ¶ 25; Doc. 1–3 at 112, § 2.a.). JCJC's speech policies apply campus-wide and are not tailored to larger gatherings that are more likely to be disruptive. Moreover, as alleged by Plaintiffs, JCJC actually *applies* its broad speech policies to tiny groups that pose no threat to any institutional interest such as campus safety, order, or accessibility. In both incidents described in the Complaint, Mr. Brown and one or two others were simply engaging with passing students as they traversed JCJC's campus, and did not disrupt JCJC's operations in any way. (*See* Compl. ¶¶ 44, 46, 76.)

Courts routinely invalidate prior-restraint schemes like JCJC's that do not exempt individuals and small groups from permit requirements. In *Knowles v. City of Waco*, 462 F.3d 430 (5th Cir. 2006), for example, the Fifth Circuit explained that "ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest." *Id.* at 436. Thus, the Fifth Circuit held unconstitutional a city's "Parade ordinance" that "may be interpreted to require a prior permit for the activity of as few as two people." *Id.*

Like the Fifth Circuit, other courts of appeals also routinely invalidate prior restraints that apply to individuals and small groups. *See, e.g.*, *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 525 (D.C. Cir. 2010) ("Requiring individuals and small groups to obtain permits before engaging in expressive activities within designated 'free speech areas' (and other public forums within national parks) violates the First Amendment."); *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) ("Because its language applies to small groups . . . Section 2 of the Ordinance is unconstitutional on its face."); *Cox v. City of Charleston*, 416 F.3d 281, 286 (4th Cir. 2005) ("[A]ny group of individuals who gather together on the sidewalks for a 'meeting' or 'assembly'—no matter how innocuous—is in violation of the

Ordinance unless the group first obtains a permit from the city administrator.  Because the City has not established why burdening such expression is necessary to facilitate its interest in keeping its streets and sidewalks safe, orderly, and accessible, we hold that the Ordinance . . . facially violates the First Amendment."); *Grossman v. City of Portland*, 33 F.3d 1200, 1207 (9th Cir. 1994) ("[W]e simply cannot agree that six to eight people carrying signs in a public park constituted enough of a threat to the safety and convenience of park users . . . to justify the restrictions imposed on their speech here.").

Defendants' joint motion to dismiss all but admits that JCJC's speech policies are unconstitutional.  Over the span of seven pages, Defendants argue that the individual defendants are entitled to qualified immunity. (Defs.' Br. in Supp. Mot. To Dismiss, Doc. 15 at 9–15.)  But at no point do Defendants contend that JCJC's speech policies are constitutional—or even arguably constitutional.  This conspicuous omission is telling because "[t]he doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Zadeh v. Robinson*, 928 F.3d 457, 463–64 (5th Cir. 2019) (internal quotation marks omitted).  The implication is clear.  As Defendants effectively concede, no one can reasonably believe that JCJC's speech policies are legal.

**B.     JCJC's Unconstitutional Discretion in Censoring Speech**

JCJC's speech policies are also unconstitutional because they vest the college with unbridled discretion to decide which students can speak, and about what they might speak.

The Supreme Court has explained that "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (internal quotation marks omitted).  "A government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because

such discretion has the potential for becoming a means of suppressing a particular point of view." *Id.* at 130 (internal quotation marks omitted). "The reasoning is simple: If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted." *Id.* at 131 (internal citations and quotation marks omitted). *Accord, e.g.*, *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 772 (1988); *Kunz v. New York*, 340 U.S. 290, 293–95 (1951). "There is a 'heavy presumption' of invalidity for prior restraints that grant the licensing authority broad discretion." *Serv. Emps. Int'l Union, Local 5*, 595 F.3d at 596 (quoting *Forsyth Cnty.*, 505 U.S. at 130).

JCJC's speech policies contain no standards—let alone narrow, objective, and definite standards—for approving or denying speech. The "Assemblies Regulations" provide no standards for when JCJC will permit a "meeting or gathering for any purpose." (Compl. ¶ 25; Doc. 1–3 at 112, § 2.a.). The "Scheduling and Planning" section not only is devoid of objective standards but instead forthrightly states that "[t]he Vice President of Student Affairs reserves the right to schedule or not schedule any activity." (Compl. ¶ 30; Doc. 1–3 at 111, § 1.a.) These policies subject student speech entirely to the "whim of the administrator." *Forsyth Cnty.*, 505 U.S. at 133. "The First Amendment prohibits the vesting of such unbridled discretion in a government official." *Id.*; *accord City of Lakewood*, 486 U.S. at 772.

## CONCLUSION

The First Amendment prohibits the Defendants from "abridging the freedom of speech." U.S. Const. amend. I. As a public institution of higher education, JCJC should be encouraging speech, not stifling it. Its unconstitutional conduct cannot stand.

JCJC need not—and should not—wait for a court with jurisdiction to steamroll it into compliance. It should comply voluntarily with the First Amendment—and soon.

Dated:  December 9, 2019

Respectfully submitted,

ERIC S. DREIBAND
Assistant Attorney General

D. MICHAEL HURST, JR.
United States Attorney

/s/ Elliott M. Davis
ELLIOTT M. DAVIS
(N.Y. Reg. No. 4596755)
Acting Principal Deputy
   Assistant Attorney General

MARC A. PEREZ
Chief, Civil Division
Assistant United States Attorney

MATTHEW J. DONNELLY
Trial Attorney

United States Department of Justice
Civil Rights Division
950 Pennsylvania Ave. NW
Washington, DC  20530
Telephone:  (202) 514-4609
Facsimile:   (202) 514-0293
Email:        elliott.davis@usdoj.gov


REED D. RUBINSTEIN
Principal Deputy General Counsel

CHRISTINE PRATT
Attorney Advisor

United States Department of Education
Office of the General Counsel
400 Maryland Ave. SW
Washington, DC  20202