**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**J. MICHAEL BROWN; YOUNG AMERICANS
FOR LIBERTY AT JONES COUNTY
JUNIOR COLLEGE**

                                                                **PLAINTIFFS**

**v.**                                          **CIVIL ACTION NO. 2:19-cv-00127-KS-MTP**

**JONES COUNTY JUNIOR COLLEGE;
BOARD OF TRUSTEES OF JONES COUNTY
JUNIOR COLLEGE; JESSE SMITH, in his
individual and official capacities; MARK EASLEY,
in his individual and official capacities, GWEN
MAGEE, in her individual and official capacities,
And STAN LIVINGSTON, in his individual
and official capacities**                          **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This cause comes before the Court on Defendants' Motion to Dismiss [14]. Plaintiffs have filed their response [18,19], and Defendants replied [21]. Having reviewed the parties submissions, the record in this matter, and the relevant legal authorities, and otherwise being fully advised in the premises, the Court finds that the motion will be granted in part and denied in part.

This case arises from two specific incidents that occurred on the campus of Jones County Junior College ("JCJC") in early 2019 and Plaintiffs' challenges to the constitutionality of certain provisions in the college's Student Handbook. Defendants have moved to dismiss the Complaint. Defendants argue that the Plaintiffs lack standing to bring the Complaint; that the individual Defendants are entitled to qualified immunity on the individual capacity claims; and that Plaintiffs have failed to allege sufficient facts to support an award of damages. On December 9, 2019, the United States filed a Statement of Interest pursuant to 28 U.S.C. § 517 [23], arguing that JCJC's speech policies violate the First Amendment but taking no position on the issues in Defendants' Motion to Dismiss. [23] at p. 3.

## I. BACKGROUND

Plaintiff J. Michael Brown was a student enrolled at Jones County Junior College ("JCJC") at the institution's Ellisville campus between August 2018 and August 2019. [1] at ¶¶ 12, 116. Brown has been a member of the national organization Young Americans for Liberty ("YAL"), a libertarian youth advocacy organization with chapters on college and university campuses nationwide, since August 2018. That same month he founded a JCJC chapter of YAL. *Id.* ¶ 38. YAL is an unrecognized student organization at JCJC. *Id.* ¶ 13.

Defendants are JCJC, its Board of Trustees, and individually-named JCJC administrators and police, who are sued in their official and individual capacities. *Id.* ¶¶ 14-19. The Individual Defendants are President Dr. Jesse Smith, Executive Vice President of Student Affairs Gwen Magee, Dean of Student Affairs Mark Easley, and Chief of Police Stan Livingston. *Id.* Plaintiffs allege that the Individual Defendants implemented JCJC's policies to deprive Plaintiffs of their constitutional rights, including supervising staff responsible for their enforcement. *Id.* Plaintiff also alleges that Defendants Easley and Livingston also directly enforced the policies at issue in this case to violate Plaintiffs' constitutional right to free speech. *Id.* ¶¶ 18-19.

### A. The Two Incidents

On February 26, 2019, Brown and a former JCJC student, Mitch Strider, who is also a member of YAL's national organization, visited the JCJC campus to talk to students about YAL's mission in an effort to recruit new members for the chapter. *Id.* ¶ 41. Brown and Strider inflated an oversized beach ball, which they referred to as a "free speech ball." *Id.* ¶ 42. They took the ball to JCJC's central quadrangle, Centennial Plaza,1 and, for approximately one hour, invited passing students to write messages on the ball, while Brown and Strider talked to them about issues important to YAL and encouraged them to sign up for the chapter. *Id.* ¶ 43. Brown and Strider wrote down contact information of students interested in learning more about the chapter on a

sign-up sheet. *Id.* Brown and Strider's activities caused no disruption to pedestrian or vehicular traffic or in any other way disrupted JCJC's operations. *Id.* ¶ 44.

Thereafter, Brown and Strider moved with the ball to a grassy area next to the Administration Building. *Id.* ¶ 45. Once there, they were approached by an unidentified JCJC staff person, who asked if they had spoken with JCJC Dean of Students Mark Easley about their expressive activity and received permission to be on campus. *Id.* ¶¶ 47-48. Shortly thereafter, Dean Easley and another JCJC staff member, Luke Hammonds, approached. *Id.* ¶ 49. Easley informed Brown and Strider that they were not permitted to be on campus with the free speech ball because they had not followed JCJC's policies to gain administrative approval for the activity. *Id.* ¶¶ 50- 51.

Dean Easley then called JCJC Chief of Campus Police Stan Livingston. *Id.* ¶ 54. While Dean Easley spoke to Livingston, JCJC staff member Hammonds stated loudly that the free speech ball had "profanity all over it." *Id.* ¶ 56. At that point, Brown asked Hammonds what would happen if he refused to remove the free speech ball from campus, and Hammonds responded that they would let Livingston "handle all that." *Id.* ¶ 57.

When Chief Livingston arrived, he ordered Brown and Strider to accompany him to his office and to leave the free speech ball outside. *Id.* ¶¶ 58-60. In his office, Livingston recalled speaking to Brown about his starting a club and asked if the free speech ball was related to the club. *Id.* ¶ 61. Brown said yes, and Livingston then told Brown that if he had an "agenda" and wanted to "do this" he needed to "clear it" with Gwen Magee— then Interim Vice President of Student Affairs—and "go through her system." *Id.* ¶¶ 62. Although Livingston acknowledged that JCJC's policy could be "ambiguous," he reiterated that Brown was not permitted to be on campus with the free speech ball until he had received permission from Magee. *Id.* ¶¶ 67-68. Livingston said that Brown would need to come back the following week to meet with Magee because she was not then on campus. *Id.* ¶ 63. Livingston also threatened to arrest Strider for trespass if he did not

3

leave campus. *Id.* ¶¶ 64-65. In response to Brown's inquiries about the policies governing his obligations as a student who wished to have a free speech ball on campus, Livingston stated that Brown needed to come back later and speak with Magee to discuss what approval procedures JCJC policy required and what expressive activity Brown was permitted to engage in on campus. *Id.* ¶ 66. Brown and Strider then deflated the ball and left campus. *Id.* ¶ 69. Since then, neither Brown nor any other member of the YAL chapter or YAL's national organization has attempted to bring a free speech ball onto JCJC's Ellisville campus or any other JCJC property for fear of disciplinary action, removal from campus, or arrest. *Id.* ¶ 72.

Several months later, however, on April 4, 2018, Brown visited the campus—this time without the free speech ball and joined by Brown's girlfriend, a JCJC student and YAL chapter member, and Nathan Moore, a staff member of the national YAL organization—to speak with students about YAL's mission in attempt to find students to join his YAL chapter. *Id.* ¶¶ 73-74. The trio stood on Centennial Plaza, near the entrance to JCJC's Jones Hall. *Id.* ¶ 74. Brown held up a sign inviting students to share their thoughts on whether marijuana should be legalized. *Id.* The three carried pamphlets and pocket copies of the U.S. Constitution to give to interested students, as well as a sign-up sheet. *Id.*

Shortly after arriving, however, while they were speaking with two students, JCJC staff member Hammonds stopped Brown and Moore and asked them what they were doing. *Id.* ¶ 77. Brown explained that they were speaking with students about civil liberties and the government. *Id.* ¶ 80. Hammonds then asked if Brown had been on campus earlier with a beach ball. *Id.* ¶ 81. After Brown responded in the affirmative, Hammonds summoned JCJC campus police. *Id.* ¶ 84. The students who had been speaking to Brown and Moore then walked away. *Id.* ¶ 86. Hammonds took Brown, his girlfriend, and Moore to the vestibule of Jones Hall to await campus police. *Id.* ¶ 87.

After approximately five minutes, JCJC campus police officer Kim Dikes arrived. *Id.* ¶ 19. Dikes said they were not permitted to engage in such activity on campus without prior administrative permission. *Id.* ¶ 90. When Brown asked Dikes what policy they had violated by their actions, she responded, "That's illegal, first of all, and you're on a school campus." *Id.* ¶¶ 90-91. Dikes ordered Brown and his girlfriend inside of Jones Hall and asked for their drivers' licenses and student identification cards. *Id.* ¶ 92. While Dikes was recording Brown's and his girlfriend's personal information, Livingston arrived at Jones Hall. *Id.* ¶ 94.

Chief Livingston said that Brown knew he was not allowed to engage in expressive activity on campus without administrative permission. *Id.* ¶ 95. Livingston instructed Dikes to take Brown and his girlfriend to the Administration Building while he escorted Moore to his vehicle. *Id.* ¶ 96. As they walked out of the building, Livingston ordered Moore to provide his drivers' license. *Id.* ¶ 99. When Moore declined, Livingston ordered him to leave campus and threatened to arrest him for trespass if he returned. *Id.* ¶ 100. Meanwhile, Dikes took Brown and his girlfriend to Livingston's office in the Administration Building and monitored them until Livingston returned. *Id.* ¶ 104.

When Livingston arrived, he told Brown that he was "smarter than that" and that Brown knew he was not allowed to engage in expressive activity on campus without administrative approval. *Id.* ¶ 106. Livingston told Brown he could not be on campus "interrupting the education process" and accused him of trying to make him "look like a fool." *Id.* ¶¶ 106-107. Brown said he thought it was the presence of the free speech ball that prompted JCJC administrators and police to stop his earlier expressive activity and that he thought he did not need prior administrative permission to simply engage fellow students in conversation. *Id.* ¶ 108. Livingston insisted that Brown must go through Magee's "process" before engaging in any expressive activity on campus and warned Brown not to cause any more "trouble" before the end of the semester. *Id.* ¶¶ 109-110. Dean Easley then entered the office at Livingston's invitation and reiterated to Brown that he must

obtain prior approval before conducting any "events" on campus. *Id.* ¶¶ 111-113. Although Brown continued as a student at JCJC throughout the 2019 spring and summer semesters, neither he nor any other member of the YAL chapter or YAL's national organization engaged in expressive activity on the Ellisville campus or any other JCJC property after April 4, 2019, for fear of disciplinary action, removal from campus, or arrest. *Id.* ¶ 116.

### B. The Challenged Policies

JCJC's Student Handbook contains section entitled Code of Conduct ("Conduct Code").[1] The terms of the Handbook require that all student who register at JCJC agree to comply with the Conduct Code's regulations and policies and are subject to disciplinary action for any violations. [1] at ¶ 22. The Conduct Code sets forth actions that are considered violations of college regulations, one of which is contained in Paragraph 9, which states:

> 9. Disruptive Activity, which is any action by an individual, group, or organization to impede, interrupt, interfere with, or disturb the holding of classes, the conduct of college business, or *unauthorized events and activities of any and all segments of the college.*
>
> \*\*\*
> 17. Disorderly conduct, sexual assault, lewd, indecent, or obscene conduct, or public profanity on campus or at a college function.

[1-2] at pp. 4, 5 (emphasis added).

The Student Handbook also contains a subdivision on Student Affairs, which contains a section titled "Student Activities Policies." [1-3] at p. 2. This section contains, among others, the following provisions:

> 1. Scheduling and Planning, which states, in part:
>
> a. All college connected student activities conducted by a student organization at Jones County Junior College must be scheduled by the Vice President of Student Affairs. The Vice President of Student Affairs reserves

---

[1]  The Court referenced the Student Handbook for the 2018-2019 academic school year at
https://web.archive.org/web/20190710155131/http://www.jcjc.edu/studentpolicies/docs/studenthandbook.pdf

the right to schedule or not schedule any activity. Where the activity is not
scheduled, the sponsoring organization may request a hearing before the
Student Affairs Committee. Only approved student organizations may
conduct student activities on or off the campus.

b. Permission for student activities may be obtained by completing the
"Activity/Speaker Application Form" available on the myJones *Insider*. All requests
are due in the Office of the Student Affairs [*sic*] **five days**
preceding the activity. […]

\*\*\*
2. Assemblies Regulations, which states, in part:

a. Any student parade, serenade, demonstration, rally, and/or other meeting
or gathering for any purpose, conducted on the campus of the institution
must be scheduled with the President or Vice President of Student Affairs
**at least 72 hours** in advance of the event. (Forms available in Student
Affairs) Names of the responsible leaders of the groups must be submitted
to the institution at the time of scheduling.

b. Students assembling for any meeting not authorized in accordance with
paragraph one [indicating paragraph 2.a.] are subject to proper disciplinary
action. Students present at such unauthorized meetings are considered to
be participants.

[1-3] at pp. 2-3 (emphases added).

### C. Plaintiffs' Claims

In their First Cause of Action, Plaintiffs have alleged a facial challenge to the JCJC policies
and procedures governing students' expression in violation of their freedom of speech under the
First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against the Defendants, Board of
Trustees of JCJC, Smith, Magee, Easley, and Livingston. Their Second Cause of Action is the
same as the first claim, only this claim is an as-applied challenge to the JCJC policies and
procedures governing students' expression in violation of their freedom of speech under the First
and Fourteenth amendments pursuant to 42 U.S.C. § 1983 against the same Defendants.

Plaintiffs' Third Cause of Action is for First Amendment Retaliation under 42 U.S.C. §
1983 against Defendant Livingston. Plaintiffs' Fourth Cause of Action is for a *Monell* Claim for

liability under 42 U.S.C. § 1983 against JCJC;[2] and Plaintiffs' Fifth Cause of Action is for Declaratory Relief and Injunction pursuant to 28 U.S.C. §§ 2201, *et seq.* as to all Defendants. For all of these claims Plaintiffs seek declaratory relief, injunctive relief, and money damages. [1] at ¶¶ 134, 141, 151, 158.

## II. DISCUSSION

### A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(1), "'[w]hen standing is challenged on the basis of the pleadings,' [the court] must 'accept as true all material allegations of the complaint and . . . construe the complaint in favor of the complaining party.'" *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quoting *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988) (citations and internal quotation omitted)).

"To survive a motion to dismiss under Rule 12(b)(6), 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Hollins v. City of Columbia*, No. 2:19-CV-28-KS-MTP, 2019 U.S. Dist. LEXIS 122381, at *3 (S.D. Miss. July 23, 2019) (Starrett, J.) (quoting *Great Lakes Dredge & Dock Co. LLC v. La. State*, 624 F.3d 201, 210 (5th Cir. 2010)). "The Court must 'accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff.'" *Id.* (quoting *Great Lakes Dredge & Dock Co. LLC*, 624 F.3d at 210). "[T]he Court will not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Id.* (quoting *Great Lakes Dredge & Dock Co. LLC*, 624 F.3d at 210). "Likewise, 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010)).

---

[2] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

### 1. Standing

"[T]he requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Davis v. FEC*, 554 U.S. 724, 733 (2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). In order to have standing, a plaintiff must show (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact (2) a sufficient causal connection between the injury and defendant's conduct and (3) the requested relief will redress the injury. *See Glass v. Paxton*, 900 F.3d 233, 238 (5th Cir. 2018) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014)); *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006).

Defendants argue that Plaintiffs do not have Article III standing for a facial challenge because they are unable to show an "injury in fact" due to Brown's no longer attending JCJC and YAL's status as an unrecognized student organization. Although Defendants do not specifically address the as-applied challenge,[3] as Plaintiffs point out, they have pled both and argue they have standing for both.

### a. Brown's standing

The Court finds that the facts of this case, as pled in the Complaint, sufficiently establish that Brown has suffered an injury-in-fact for both an as-applied challenge and a facial challenge. Brown has alleged that he attempted to exercise his First Amendment rights on two occasions, but various individuals stopped his on-campus speech due to Brown's failure to first comply with the challenged JCJC policies and procedures. Brown also alleged that while he continued as a

---

[3] Defendants do not specifically address the as-applied challenge, and the Court is uncertain whether the omission was inadvertent or intentional.

student throughout the spring and summer semesters, he did not engage in any expressive activity for fear of disciplinary action, removal from campus, or arrest.

### i. Injury-in-Fact

Defendants rely on the fact that Brown is no longer a student and no longer faces any threat of enforcement and that he does not allege an intention to engage in any future course of conduct on the campus. Defendants' argument misses the mark. Recall that an injury-in-fact must be that one "has suffered or imminently will suffer." *Barbour*, 529 F.3d at 544. Oftentimes those who bring facial challenges have yet to face any enforcement or actual injury, and thus, the federal courts in those situations will "relax the prudential limitations and allow yet unharmed litigants to attack potentially overbroad statutes." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F3d 747, 754 (5th Cir. 2010). As such, those plaintiffs must allege that there is an intention to engage in a course of conduct that involves a constitutional interest but is proscribed by a regulation on speech in order to satisfy the injury-in-fact requirement of standing. *Barbour*, 529 F.3d at 545.

Here, there is no need to show a future intent to engage in an activity because the injury has already occurred both by the stopping of his expression on two occasions and Brown's alleged curtailment of his activities after the two incidents. *See Fairchild v. Liberty Indep. Sch. Dist.*, 597 F3d 747, 754-755 (5th Cir. 2010) (holding that former teacher had standing for a facial challenge to district rule governing public comment at board meetings because she had curtailed her own speech during board meeting). The Court also finds that Brown has sufficiently pled injury in order to satisfy both an as-applied and facial challenge to the public profanity provision because his activity with the free speech ball, which had profanity on it, was shut down and he never returned to campus with it.

### ii. Requested Relief

While the fact that Brown is no longer a student does not affect the injury-in-fact portion of the analysis, it may affect the third prong of standing, which is that the relief sought will address the injury. Brown seeks damages, declaratory relief, and injunctive relief. The Court agrees with Brown that, based on the alleged past injury, he clearly has standing to pursue damages. Contrary to Defendants' urging, the Court will not engage in an analysis at this stage of the proceedings as to whether Brown has any basis for an award of damages. After discovery, such issue may be ripe for summary judgment, but the Court will not dismiss Brown's claim for damages at this time.

Brown concedes that his status as a former student might normally deprive him of standing to seek declaratory and injunctive relief, but argues that this Court should hold that he and YAL have third-party standing to seek these forms of relief in the context of the overbreadth challenge. Defendants argue that third-party standing and an overbreadth challenge should not be allowed because Plaintiffs have not shown that the policies were validly applied to them but are overbroad in that they may restrict the speech of others. [21] at p. 2 (citing *Nat'l Federation of the Blind v. Abbott*, 647 F.3d 202, 210 (5th Cir. 2011)). The Court finds that Brown indeed has standing to argue a facial overbreadth challenge in this instance based on Brown's past injury.

With regard to standing for the particular relief sought, the Court finds that declaratory relief for Brown's past injury should be allowed through the facial challenge to the JCJC policies without having to specifically invoke third-party standing because a favorable outcome will provide adequate redress not only for his injuries but also for other students in the future. *Cf. Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984). The *Taxpayers for Vincent* case involved a constitutional challenge to a state statute, wherein the

Supreme Court explained:

> The seminal cases in which the Court held state legislation unconstitutional "on its face" did not involve any departure from the general rule that a litigant only has standing to vindicate his own constitutional rights. In *Stromberg v. California*, 283 U.S. 359 (1931) and *Lovell v. Griffin*, 303 U.S. 444, (1938), the statutes were unconstitutional as applied to the defendants' conduct, but they were also unconstitutional on their face because it was apparent that any attempt to enforce such legislation would create an unacceptable risk of the suppression of ideas. In cases of this character a holding of facial invalidity expresses the conclusion that the statute could never be applied in a valid manner. Such holdings invalidated entire statutes, but did not create any exception from the general rule that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court.

466 U.S. at 796–98. Although this case does not involve a statute but rather school policies regarding student conduct and activities, Brown has alleged that the policies are facially invalid, such that any attempt to enforce the policies would create an unacceptable risk of suppression of speech anywhere on the campus by any student and any student organization. If such is truly the case, then a declaration that the policies are facially invalid as applied to Brown and as applied to any student would protect others beyond Brown without the need for any departure from the general rule that Brown only has standing to vindicate his own rights.

However, as to relief through a preliminary injunction, the Court finds Brown has no standing. Because he is no longer a student, Brown is no longer subject to JCJC policies, and a preliminary injunction will not redress his injury. *Cf. Olivo v. Duncan*, 317 Fed. Appx. 686 (9th Cir. 2009) (denying injunctive relief because student not currently enrolled in any school); *Fry v. Board of Regents of Univ. of Wisc.*, 132 F. Supp. 2d 740, 743 (W.D. Wisc. 2000) (finding former students' claims for injunctive relief were moot because they no longer face imminent injury). Here, contrary to Plaintiffs' claims, there is no need to prevent further violation of Plaintiffs' constitutional rights as there is no threat of future enforcement or imminent injury because Brown is no longer a student. Therefore, he may not seek redress through an injunction.

### b. YAL's standing

An association has Article III standing to bring a suit on behalf of its members only when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Funeral Consumers All., Inc. v. Serv. Corp. Int'l,* 695 F.3d 330, 343 (5th Cir. 2012) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). To satisfy the first prong of this test, an organization must "include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *Funeral Consumers All*., 695 F.3d at 343-44 (citing *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc*., 517 U.S. 544, 555 (1996)).

The Court finds that YAL has no standing to present any claims in this suit. While Brown was a student at JCJC and subject to the policies and procedures at that time, YAL is not now, nor ever was during the relevant time period, a recognized student organization at JCJC. Therefore, YAL was not subject to the policies and procedures being challenged. YAL complains that its rights were infringed by JCJC prohibiting "non-approved student organizations" from conducting student activities. However, it has not alleged any obstacle to applying for approved status. Had YAL applied to be a recognized student organization and its application had been denied, it might be a different story, but there are no claims regarding the student organization approval process. Just because Brown was a student and a member of a national chapter, as far as JCJC is concerned, YAL is a stranger to the campus with no rights to assert. *Cf. Bourgault v. Yudof,* 316 F. Supp. 2d 411 (N.D. Tex. 2014) (finding that evangelist, who was not a student and had no member of the college community to sponsor his program, did

13

not have standing to challenge school policy). Although YAL alleges that it wishes to engage in expressive activity on the campus, it does not have the means to do so nor has it alleged that it does. With Brown no longer a student, there does not appear to be any members of a YAL chapter at JCJC that would have standing to present a claim. Accordingly, YAL's claims must be dismissed, and it shall be terminated as a party.

### 2. Qualified Immunity

The individual Defendants assert qualified immunity for the claims against them in their individual capacities. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). However, when faced with a motion to dismiss based upon qualified immunity, a court must "first find that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012) (quotation omitted). "[A] plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Id.*

### a. Defendants Magee and Smith

Defendant Jesse Smith, who is the College President, and Gwen Magee, who is Vice Chancellor for Student Affairs, argue that Plaintiffs have failed to state a claim against them because Plaintiffs do not allege that Smith or Magee were involved in the incidents described in the Complaint or that they engaged in any conduct that violated a clearly established

constitutional right.[4] Smith and Magee focus almost exclusively on what a plaintiff must prove to establish supervisory or failure to train liability. However, as Defendants Smith and Magee themselves point out, Plaintiffs have alleged much more. With regard to these two Defendants, Plaintiffs have alleged as follows:

> Defendant Dr. Jesse Smith is, and was at all times relevant to this Complaint, the president of JCJC. Smith is the executive officer in charge of the college. Smith manages and directs all affairs of the college under policies and regulations established by the Board. Smith is responsible for the administration and enforcement of policies and regulations relating to the operation of the college. Smith is also responsible for preparing and submitting to the Board for its approval all statements of policy or programs which he believes are needed for the control and management of the college. Thus, Smith is responsible for the promulgation, implementation, and enforcement of JCJC policies, procedures, and practices, including those that were applied to deprive Brown and YAL of their constitutional rights. Smith knew or reasonably should have known that JCJC's policies, procedures, and practices would lead to this deprivation. Smith knew that individuals under his supervision implemented JCJC's policies, procedures, and practices that deprived Brown and YAL of their constitutional rights, and Smith, with deliberate indifference, failed to act with regard to the constitutional rights of Brown, YAL, and all JCJC students. At all times relevant to this Complaint, Smith acted under color of state law and is sued in his individual and official capacities.

[1] at ¶ 16.

> Defendant Gwen Magee is Executive Vice President of Student Affairs at JCJC. Upon information and belief, Magee held the title of Interim Vice President of Student Affairs at times relevant to this Complaint. Magee is a member of the Executive Cabinet, which advises the JCJC president on administrative procedures, policies, and operational matters. Among other duties, Magee is responsible for supervising and implementing policies and procedures for student conduct and discipline and for coordinating student activities and organizations. Thus, Magee is responsible for the promulgation, implementation, and enforcement of JCJC policies, procedures, and practices, including those that were applied to deprive Brown and YAL of their constitutional rights. Magee knew or reasonably should have known that JCJC's policies, procedures, and practices would lead to this deprivation. Magee knew that individuals under her supervision implemented JCJC's policies, procedures, and practices that deprived Brown and YAL of their constitutional rights, and Magee, with deliberate indifference, failed to act with regard to the constitutional rights of Brown, YAL,

---

[4] As for any argument that a heightened pleading standard is required, this Court has clarified that such is not the case. *See Hollins v. City of Columbia*, 2019 U.S. Dist. LEXIS 122381, *4-6 (S.D. Miss. July 23, 2019).

and all JCJC students. At all times relevant to this Complaint, Magee acted under color of state law and is sued in her individual and official capacities.

*Id.* at ¶ 17.

Plaintiffs also allege that Smith and Magee, along with Defendants Easley and Livingston: possess administrative and enforcement authority over JCJC's policies, regulations, and procedures and are responsible for the implementation and enforcement of the Student Handbook policies, which directly resulted in the deprivation of Plaintiffs' constitutional rights under the First Amendment to the Constitution, as applied to the states by the Fourteenth Amendment and 42 U.S.C. § 1983. Defendants knew that individuals under their supervision implemented JCJC's policies, procedures, and practices to deprive Brown and YAL of their constitutional rights, and Defendants, with deliberate indifference, failed to act with regard to the constitutional rights of Brown and YAL.

*Id.* at ¶ 138.

Finally, Plaintiffs allege Smith "is additionally responsible for preparing and submitting to the Board for its approval all statements of policy or programs which he believes are needed for the control and management of the college." *Id.* at ¶ 139.

Defendants Smith and Magee argue that these allegations are boilerplate regarding job responsibilities and are insufficient to state a claim because Plaintiffs have not alleged facts to establish that the Individual Defendants were personally involved in Plaintiffs' constitutional violations and cannot be liable for their actions as supervisors. However, the Court agrees with Plaintiffs that the Complaint contains sufficient facts, when accepted as true, to state a claim against these individuals.

As this Court has explained before, a "'supervisor may be held liable if there exists either (1) his personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Jordan v. Wayne Cty.*, No. 2:16-CV-70-KS-MTP, 2017 U.S. Dist. LEXIS 75014, at *14 (S.D. Miss. May 17, 2017) (Starrett, J.) (quoting *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir.

16

1987)). Defendants seem to argue that, absent personal involvement in an alleged constitutional deprivation, a plaintiff can only establish liability against a supervisor by showing the following: (1) the supervisor failed to supervise or train the officer; (2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights; and (3) the failure to supervise or train amounted to deliberate indifference to the plaintiff's constitutional rights. [15] at p. 12-13, referencing *Bivens v. Forrest Cty.*, No. 2:13-CV-8-KS- MTP, 2015 U.S. Dist. LEXIS 40602, at *50 (S.D. Miss. Mar. 30, 2015) (*citing Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005)). This is an incorrect statement of the law in this instance.

As Plaintiffs point out, the standard cited by Defendants applies when a plaintiff alleges that the supervisor failed to train or supervise the individual who caused the deprivation. *Miley v. Jones Cty. Jail*, No. 2:05cv2072-KS-MTP, 2007 U.S. Dist. LEXIS 54078, at *16-17 (S.D. Miss. July 25, 2007). Notwithstanding, there is an alternative basis for supervisory liability when a plaintiff alleges that the supervisor implemented "'a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Id.* at *16 (quoting *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987)); *see also Dodds v. Richardson*, 614 F.3d 1185, 1212-1213 (10th Cir. 2010) (Tymkovich, J., concurring) (noting that "several theories of [supervisory] liability are possible" under §1983.)

It is both relevant and persuasive that the Ninth Circuit has applied this standard in the university context and explained that "[a]dvancing a policy that requires subordinates to commit constitutional violations is always enough for § 1983 liability . . . so long as the policy

proximately causes the harm — that is, so long as the plaintiff's constitutional injury in fact occurs pursuant to the policy." *OSU Student All. v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012).

The Court finds that Plaintiffs have pled facts sufficient to establish liability under either the "implementing an unconstitutional policy" or the "failure to supervise" bases of liability against Defendants Smith and Magee. Plaintiffs have pled that Smith and Magee are "responsible for the promulgation, implementation, and enforcement of JCJC policies, procedures, and practices, including those that were applied to deprive Brown and YAL of their constitutional rights." [1] at ¶¶ 16-17. Specifically, Plaintiffs alleged that President Smith is the college's executive officer, managing and directing all affairs of the college under policies and regulations established by the Board of Trustees. *Id.* ¶ 16. Smith is also responsible for preparing and recommending any policy changes he believes are necessary to the Board. *Id.*

Plaintiffs allege that Vice President Magee is responsible for supervising and implementing the policies and procedures for student conduct and discipline and for coordinating student activities. *Id.* ¶ 17. Livingston expressly identified Magee as the administrator responsible for implementing the prior approval policies and procedures challenged in this action. *Id.* ¶¶ 62-63, 68, 109. Moreover, Magee is responsible for advising President Smith on administrative procedures, policies, and operational matters as a member of his Executive Cabinet. *Id.* ¶ 17.

Plaintiffs have alleged that the policies maintained and implemented by Smith and Magee are unconstitutional, and, therefore, "a repudiation of constitutional rights." *Id.* ¶¶ 122-129. Moreover, Plaintiffs have provided numerous facts detailing that these unconstitutional policies were "the moving force of the constitutional violation" because subordinates of Smith and Magee applied the policies to prevent Brown and members of YAL

from engaging in expressive activities on campus. *Id.* ¶¶ 38-118. Specifically, on February 29, 2019 and April 4, 2019, individuals under the supervision of Smith and Magee told Brown and YAL members that they could not continue to engage in their recruitment efforts because they did not receive permission from Magee in accordance with JCJC's policies. *Id.* ¶¶ 62-68, 109.

Plaintiffs have further alleged that Smith and Magee "knew or reasonably should have known" that the unconstitutional policies that they implemented would be enforced to deprive Plaintiffs of their constitutional rights and failed to take the action necessary to avoid this deprivation with deliberate indifference to the constitutional rights of Plaintiffs. *Id.* Contrary to Defendants' assertion the Complaint only contains boilerplate allegations about these Defendants' job responsibilities, the foregoing establishes that Plaintiffs have sufficiently alleged that Smith and Magee "[a]dvanc[ed] a policy that require[ed] subordinates to commit constitutional violations . . . . " *Ray*, 699 F.3d at 1076; *see also Dodds*, 614 F.3d at 1204 (affirming denial of summary judgment where "Defendant … may have deliberately enforced or actively maintained the policies in question at the jail and plaintiff had presented facts that could establish personal involvement by Defendant in the alleged constitutional violation sufficient to satisfy § 1983).

Alternatively, Plaintiffs have alleged that Smith and Magee failed to supervise Easley, Livingston, and other JCJC staff members with deliberate indifference to Plaintiffs' constitutional rights, and their deliberate indifference ultimately led Easley, Livingston, and other JCJC staff members to enforce the unconstitutional policies to deprive Plaintiffs of their constitutional rights. Plaintiffs have provided the required a short and plain statement of the relief sought by sufficiently alleging that Smith and Magee implemented unconstitutional policies and failed to supervise individuals who enforced those policies. Therefore,

Defendants' motion to dismiss Plaintiffs' claims against Smith and Magee in their individual capacities is hereby denied.

### b. Defendant Mark Easley

Defendant Easley is the Dean of Student Affairs at JCJC. The Complaint states that he is responsible for coordinating and supervising the areas of discipline, campus safety, student activities, clubs and organizations, and coordination of facility use. It goes on to allege that he also

> is responsible for the promulgation, implementation, and enforcement of JCJC policies, procedures, and practices, including those that were applied to deprive Brown and YAL of their constitutional rights. Magee knew or reasonably should have known that JCJC's policies, procedures, and practices would lead to this deprivation. Easley knew that individuals under his supervision implemented JCJC's policies, procedures, and practices that deprived Brown and YAL of their constitutional rights, and Easley, with deliberate indifference, failed to act with regard to the constitutional rights of Brown, YAL, and all JCJC students. Easley also interfered with Brown and YAL's exercise of their constitutional rights by applying JCJC policy to Brown and YAL's constitutionally protected expression and by summoning campus police to stop Brown and YAL from engaging in constitutionally protected speech.

[1] at ¶18.

Based on these allegations, like Smith and Magee above, Plaintiffs have alleged liability on the grounds of implementing and enforcing an unconstitutional policy. As noted above, Plaintiffs have alleged that these policies are facially unconstitutional, the policies were the "moving force" that caused Plaintiffs' constitutional deprivation, and that Easley acted with deliberate indifference to the constitutional rights of Brown, YAL, and all JCJC students. *Id.* ¶¶ 18, 38-118.

As to his personal enforcement of the policies at issue, Easley argues that the Complaint fails to state a claim because there are no allegations that he disciplined Brown or told him that could not participate in a YAL event on campus, but merely informed Brown and his

acquaintances about the College's policy requiring advance scheduling of student organization events. However, there is much more that has been alleged with regard to Easley. Plaintiffs have pled that Easley enforced JCJC's unconstitutional policies against Plaintiffs in order to stop their peaceful, non-disruptive expressive activity in outdoor areas of campus. *Id.* ¶¶ 47-69. Specifically, Easley told Brown and a YAL member that "they were not permitted to be present on campus with the free speech ball because they had not followed JCJC's policies to gain administrative approval for the activity." *Id.* ¶ 50. Easley then called Defendant Livingston, who ultimately stopped Brown and a YAL member from engaging in their expressive activity by ordering them to come to his office. *Id.* ¶¶ 54, 59. Moreover, on April 4, 2019, after Brown and fellow YAL members were again stopped from recruiting new members, Easley reiterated that Brown must obtain prior approval before conducting any "events" on campus." *Id.* ¶ 113.

Thus, contrary to Defendants' argument, Easley did not simply inform Plaintiffs about JCJC's policies, it is alleged that he implemented those policies and forced Plaintiffs to stop their expressive activities. *Id.* ¶¶ 71, 115. Because Easley implemented the allegedly unconstitutional policies in his supervisory role and personally enforced those policies to stop Plaintiffs from engaging in expressive activities on campus, the motion to dismiss Plaintiffs' claims against Easley in his individual capacity is hereby denied.

### c. Defendant Officer Stan Livingston

Stan Livingston is the Chief of Campus Police at JCJC and the chief law enforcement officer on the JCJC campus. Similar to the other Defendants, with regard to this Defendant, Plaintiff has alleged that Livingston is responsible for implementing and enforcing JCJC policies that led to the deprivation of Plaintiffs' constitutional rights. As to these claims, similar to those

addressed above, the Plaintiffs allege that Livingston was aware of the unconstitutional college policies and procedures at issue here, and he was aware that an officer under his supervision, Kim Dikes, applied these policies on April 4, 2019 to stop Brown and two fellow YAL members from engaging in expressive activity. *Id.* ¶¶ 19, 73-100. Plaintiffs have alleged that these policies are facially unconstitutional, the policies were the "moving force" that caused Plaintiffs' constitutional deprivation, and, here, that Livingston acted with deliberate indifference to the constitutional rights of Brown, YAL, and all JCJC students. *Id.* ¶¶ 19, 38-118.

In addition, Plaintiffs pled that Livingston failed to sufficiently supervise Dikes, demonstrating deliberate indifference to Plaintiffs' constitutional rights, and his deliberate indifference ultimately permitted Dikes to enforce the unconstitutional policy to deprive Plaintiffs' of their constitutional rights, including telling Plaintiffs that it was "illegal" to engage in their expressive activity "on a school campus" on April 4. *Id.* ¶¶ 19, 91, 137. As to his personal enforcement of the policies and procedures at issue, Livingston stopped Plaintiffs from engaging in expressive activity on February 26, 2019 and April 4, 2019. *Id.* ¶¶ 41-100. On both occasions, Livingston told Brown and other YAL members that they could not continue to recruit new members because they had not obtained pre-approval from Defendant Magee in accordance with JCJC's policies. *Id.* ¶¶ 62-68, 109. Based upon Livingston's directives that Brown could not engage in recruitment for YAL without Magee's approval, Brown could have reasonably concluded that he had been threatened with punishment or removal from campus and so was unable to continue his expressive activities. *Id.* ¶¶ 71, 115. Thus, Plaintiffs have pled that Livingston enforced the unconstitutional policies and stopped Plaintiffs from engaging in expressive activities on campus, which is sufficient to state a claim against Livingston in his individual capacity.

In addition to the supervisory/direct implementation claims, Plaintiffs also bring a retaliation claim against Livingston, who argues that in order to sufficiently state a retaliation claim, Plaintiffs must allege "(1) they were engaged in constitutionally protected activity, (2) Defendant Livingston caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) Livingston's adverse actions were substantially motivated against Plaintiffs' exercise of constitutionally protected conduct." [15] at p. 15 (citing *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)).

Defendant Livingston challenges the second element and argues that Plaintiffs have alleged only that he told Brown to schedule the YAL event with Defendant Magee, required Brown to meet with him in his office, and instructed Brown's friends to leave campus under threat of arrest. Livingston argues these are not allegations of an injury that would chill a person of ordinary firmness from engaging in their activities and that any injury Plaintiffs claim to have suffered is too "trivial or minor" to support a claim for retaliation. The Court disagrees.

To succeed on a First Amendment retaliation claim, a plaintiff must prove that the defendant's *actions* would chill a person of ordinary firmness from engaging in expressive activities as well as an injury. For example, in *Keenan*, the Fifth Circuit found that the defendants' actions of detaining the plaintiff were "sufficiently intimidating to chill the speech of a person of ordinary firmness." *Keenan*, 290 F.3d at 259. After reaching this conclusion, the Firth Circuit then analyzed whether the plaintiffs pled that they suffered an injury, concluding that they did because the plaintiffs "curtailed their protected speech activities in response to the defendants' actions." *Id.* at 260 (reversing district court's finding that plaintiffs failed to identify an injury). Thus, at this stage of litigation, this Court must determine if Brown pled an

injury and actions by the defendants that would "chill a person of ordinary firmness from engaging in expressive activities."

An officer's threat to arrest individuals or their companions in retaliation for protected expression would chill a person of ordinary firmness from continuing to engage in that expressive activity. As Plaintiffs point out, "[t]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). As the Fifth Circuit explained, "'Any form of official retaliation for exercising one's freedom of speech, including prosecution, *threatened prosecution*, bad faith investigation, and legal harassment, constitutes an infringement of that freedom.'" *Izen v. Catalina*, 398 F.3d 363, 367 n.5 (5th Cir. 2005) (emphasis added) (citing *Smith v. Plati*, 258 F.3d 1167, 1176 (10th Cir. 2001)); *see also Andrews v. Scott*, 729 F. App'x 804, 812 (11th Cir. 2018) (affirming motion to dismiss noting that "even the threat of arrest would likely deter a person of ordinary firmness from the exercise of First Amendment rights …."); *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004) ("The Supreme Court has often noted that a realistic threat of arrest is enough to chill First Amendment rights.") (citing *City of Hous., Tex. v. Hill*, 482 U.S. 451, 459 n.7 (1987)). Even law enforcement action directed at individuals associated with a plaintiff has been found to be sufficiently chilling. *Mills v. City of Bogalusa*, 112 F. Supp. 3d 512, 517 (E.D. La. 2015) (finding that officers' harassment of plaintiff's relative and process server sufficiently chilling).

Livingston chilled Brown from engaging in expressive activities and recruiting on behalf of YAL when he responded to complaints by JCJC officials on February 26, 2019 and April 4, 2019. [1] at ¶¶ 58, 95. On both occasions, Livingston told Brown and other YAL

24

members that they could not continue to talk to students. *Id.* at ¶¶ 68, 95. Also, Livingston required Brown and other YAL members to stop their activities and chastised Brown about engaging in on campus activities without administrative permission. *Id.* at ¶¶ 60, 95. Livingston also ordered the YAL members accompanying Brown to leave campus and threatened to arrest them if they returned. *Id.* at ¶¶ 64, 100-103. Finally, Livingston directed Dikes to take Brown to his office and when in the office, Livingston again chastised Brown regarding his on-campus activity. *Id.* at ¶ 106.  Livingston insisted that Brown go through Magee's process before engaging in any expressive activity on campus and insinuated that Brown would be punished for any future expressive conduct, telling him not to "cause any more 'trouble' before the end of the semester." *Id.* at ¶¶ 110-111.

The Court finds that Livingston's actions, as alleged, would be severe enough to chill a person of ordinary firmness from continuing to engage in that activity. In fact, accepting all allegations as true, Plaintiffs specifically allege that Brown *was* intimidated by Livingston's actions and that he and other members of YAL refrained from engaging in any further expressive activity at JCJC, including any further recruitment efforts. *Id.* ¶116. In total, Brown has sufficiently pled that Livingston engaged in actions that resulted in an injury and would chill a person of ordinary firmness from continuing to engage in protected activity.

Because Brown has sufficiently pled that Livingston implemented the unconstitutional policies in his supervisory role and personally enforced those policies to stop Brown from engaging in expressive activities on campus, and because Brown has sufficiently alleged a retaliation claim, the Defendants' motion to dismiss Plaintiffs' claims against Livingston in his individual capacity is denied.

**III. CONCLUSION**

For the reasons set forth herein, it is hereby ORDERED that Defendants' Motion to Dismiss [14] is GRANTED IN PART and DENIED IN PART. The motion is GRANTED in so far as the Court has found that Plaintiff, Young Americans for Liberty at Jones County Junior College, does not have standing to assert any claims in this action, and all such claims are hereby dismissed without prejudice. In all other aspects, the motion is DENIED.

The Court notes that because the defense of qualified immunity was raised only insofar as the sufficiency of the pleadings was concerned, the motion is denied without prejudice to raising the defense again in a dispositive motion at the close of discovery.

SO ORDERED AND ADJUDGED this 28th day of May 2019.


/s/ Keith Starrett _____
KEITH STARRETT
UNITED STATES DISTRICT JUDGE